JOHN BARTON PAYNE, Director General of Railroads,

*vs.*

JACOB M. A. HEALEY.

*Contributory Negligence—Last Clear Chance—Action Against Railroad Company—Engine "Picking Up" Automobile.*

The doctrine of last clear chance applies as against the defendant when, with ordinary care and caution, he ought to have been aware of plaintiff's peril, as well as when he was actually aware thereof.　　　　　　　　　　　　　　　　　　　p. 97

In an action for injury to plaintiff and to his automobile, caused by a collision of the latter with a semaphore, as a result of its being "picked up" by defendant's engine at a street crossing and so carried along with the train as far as the semaphore, *held* that upon the evidence plaintiff's failure to blow his horn after his automobile became attached to the engine did not, as a matter of law, show contributory negligence.　　　　　p. 98

In an action for injury to plaintiff and to his automobile caused by the latter's collision with a semaphore, as a result of its being "picked up". by defendant's engine at a street crossing and so carried along with the train as far as the semaphore, *held* that evidence that defendant's engineer could have seen the automobile before "picking it up," and that those in charge of the train were called and signalled to by persons nearby in order to warn them of plaintiff's perilous position, was sufficient to go to the jury as tending to show that those operating the train, by ordinary care and caution, could have avoided the collision with the semaphore.　　　　　　　　　　　　　　　　p. 99

Evidence as to whether those operating the train used proper care and caution before and while crossing the street was admissible, not to determine defendant's liability for the injury, if any, caused by the collision of the train with the automobile, this not being involved in the suit, but because such evidence aided in determining whether defendant's employees by proper

care and caution could have avoided the collision of the automobile with the semaphore, after they knew, or by reasonable care and caution could have known, of plaintiff's perilous situation caused by the collision of his automobile with defendant's engine. p. 100

*Decided June 28th, 1921.*

Appeal from the Circuit Court for Washington County (WAGAMAN, J.).

Action by Jacob M. A. Healey against John Barton Payne, Director General of Railroads, operating the Cumberland Valley Railroad. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*William P. Lane* and *Henry H. Keedy, Jr.,* for the appellant.

*J. Lloyd Harshman* and *Albert J. Long,* with whom was *Charles D. Wagaman* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from a judgment recovered by the appellee, Jacob M. A. Healey, against the appellant, John Barton Payne, Director General of Railroads, for personal injuries sustained by him, as well as for injury and damage to his automobile, caused by the alleged negligence of the employees of the defendant in the operation of the defendant's train.

The record discloses that, on January the 6th, 1920, at the hour of one in the morning, the plaintiff and Dr. Fiery, a dentist, who was at the plaintiff's house in Hagerstown, upon a professional visit to a member of plaintiff's family, started

in plaintiff's automobile for the doctor's home. The plain-
tiff testified that, while going east on West Antietam Street,
he approached the tracks of the Cumberland Valley Railroad,
which cross that street. At that time, he says, a freight train
was approaching from the north. It was, however, going so
smoothly that he did not hear it, but as soon as he saw it, he
put on his brakes and stopped his automobile. The train was
on the west track, the one nearest to the plaintiff, and al-
though the automobile was stopped before it reached the
track, it nevertheless was so near to it that the engine
"picked" it up, and carried it down the track for more than
three hundred feet to the point where the semaphore stood,
on the west side of the railroad; while being carried down to
the semaphore, the automobile moved smoothly; did not seem
to jar very much, and he thought the right wheels were not
off the ground; and it ran along as if it were on rails. While
he was so carried along, he called as loud as he could to those
on the engine to stop, and he heard someone else calling,
"Stop, you have picked up an automobile." When he heard
the man calling, he was down the track half way from the
point of the collision to the semaphore and he jumped from
the automobile just before the crash came; that he heard the
air-brakes thrown on, and the train stopped in about a car's
length; it was moving about the same rate of speed when the
machine struck the semaphore as it was when it picked him
up. The automobile was a Packard about eighteen feet long
and a very high one, and, while being carried down the track,
it was alongside of the engine, the front part at the cow-
catcher. The top of the car was up and the back curtains
were up, but the other curtains were not on at all. The car
was totally wrecked except the motor, and the plaintiff was
personally injured.

Upon cross-examination, the plaintiff stated that he was
running about ten or twelve miles an hour down Antietam
Street; and as soon as he saw the engine he put on his brakes
and stopped; he could not tell how far he was away from the

track; whether ten, twenty, or thirty feet; he knew nothing
about feet; and the defendant's counsel was unable to have
him state more definitely the distance he was from the track
when he first saw the engine; he stated that he had a klaxon
horn on the car, but he did not blow it while being carried
down the track by the engine. The witness further stated
that he thought the train at the time of the collision was going
at the rate of twenty miles an hour, but in this, as conceded
by his counsel, he over-estimated its speed, as it was moving
only five or six miles an hour.

D. J. Minnichs, an employee of the Cumberland Valley
Railroad Company, testified that at the time of the collision
he was "at the watch-box," which is located on the south side
of Antietam Street and a short distance west of the west
track of the railroad, and saw the collision, but did not have
time to signal before the locomotive struck the automobile;
that immediately after it happened, he called out; he did not
recall what he said, and then swung his lantern; that he
called to the engine-man who was in the cab of the engine;
but did not know that he saw him. The witness was at the
time at the watch-box and the engine was "right by him."
He gave the stop signal with the lantern, but the engine was
by him, as he thought, west of Antietam Street, the watch-
box being several feet west of the street, that is, it is off the
street but right by the pavement; that when he said west, he
was speaking in railroad terms, what they called west, which
is in fact south. He further testified that he thought he
heard somebody call out when the car was struck; that as the
automobile was about to cross the track, it veered to the right;
it was close to the pavement and went over the edge of the
pavement; and after the collision the automobile was along-
side of the locomotive and facing in the same direction. "The
engine part of the automobile was alongside on the pilot of
the locomotive, on the right-hand side." The wheels of the
automobile seemed to be on the ground. The witness was a
brakeman and had been one for four years and was able to

judge of the speed of trains; the train was going about five or six miles an hour at the time of the collision, and when it stopped it was just past the semaphore, a little over the length of the engine and tender; that he did not hear anyone call out after the locomotive passed him; but heard someone when the automobile was first hit. After that he did not hear anyone calling.

Upon cross-examination, the witness testified the first thing he noticed with reference to the accident was when the automobile came up Antietam Street, real close to him, and he heard the brakes which were then applied; the engine was about half way over Antietam Street crossing and this automobile ran out by the watch-box and on the crossing like; the automobile was near the crossing when he first saw it on the right-hand side; he was a little off the street when he was struck, a little to the right of the street, not the whole automobile, but the right side of it would have taken in a little more than the street; the automobile was struck by the pilot of the engine and carried down the track by the engine on the pilot, that he did not notice it running on its own wheels.

W. G. Price, fireman upon the engine that collided with plaintiff's automobile, testified that he was in the cab of the engine on the left side, and with him on the engine were L. S. Feagan, the engineer, and T. F. Price, the conductor; the engineer was on the right side, the same side as the automobile, and the conductor on the left side; the train was running five or six miles an hour as it crossed Antietam Street, and the speed was about the same from that point down to the semaphore; that he remembered the emergency brakes being thrown on; it was near the semaphore; the train stopped in about forty feet after the emergency brakes were thrown.

T. F. Price, the conductor, testified that he heard the application of the air brakes, and that the car stopped within about forty feet thereafter, and the train was going about four to six miles an hour.

John Dennis, who was employed by the Cumberland Valley Railroad Company as car inspector, testified that, at the time of the collision, he was in the inspector's building, which is about forty or fifty feet west of the main track and about the same distance from Antietam Street; that he was looking out and saw the train and automobile strike; that he immediately went out and gave the engineer a stop signal with the lantern and hollered: "You hit a car, you have a car hanging on you." He was unable to say whether the engineer was looking and could see the signal. When he signalled, the engine had passed him about the distance of the length of an engine and a half; that he hollered loud enough that he should think the man would hear him, but (for) the noise of the train; that he did not know whether he could hear him or not; the train was making the usual noise that a train makes at that speed; the engine had gotten hold of the automobile right on the pilot between the front and rear of the automobile; the automobile was right between the cylinder and the pilot; it was a clear cold night, the moon was shining; after he gave the signal, he followed the train down towards the semaphore; he was going about the same rate of speed as the train, he walked along at a pretty fast canter, was not running exactly; that after the air-brakes were thrown on, it went between twenty-five and forty feet.

Upon cross-examination, he stated that the automobile was between the watch-box and the railroad track when the collision occurred; that he saw them both coming; the engine was coming and the automobile came up at the same time; the automobile was something like ten feet from the track when he first saw it; one wheel went over the pavement. The automobile "did not go over the rails, it was hooked on the side of the engine."

V. M. Jenkins, who was in the inspector's shanty, the door of which was at the time open, heard Dennis call out, "You have hit an automobile." He called very loud.

The plaintiff, when recalled as a witness, stated that the electric street light on Antietam Street, which was shown by the evidence to have been located fourteen feet west from the near rail, was right over the rear of his car when he stopped. He could see the light around him.

G. A. Boyer, who was also in the car inspector's shanty. at the time of the collision, testified that he heard Dennis cry out, "There the train has hit an automobile," and he called to Minnichs to give the signal to stop the train. "Dennis hollered as loud as he could," he heard him plain; at the time he hollered the engine was right at the watch-box. Both Dennis and Minnichs called to them on the engine.

Upon cross-examination the witness stated that Dennis was on the inside when he first called and the door was shut; that he grabbed his lantern, went out and witness followed right behind him; the engine was then about half way down to the semaphore and the automobile was hanging on the cross-sill of the engine. It was hanging on steam cylinder.

Harold G. Van Ripper, a civil engineer, employed by the Pennsylvania Railroad Company, who had made a plat of the scene of the accident, testified that "there are five tracks across Antietam Street; that the nearest side of the watch-box is 9 feet, 11 inches from the nearest rail and the watch-box is 8 feet, 6 inches from the curb line of the pavement," that "the semaphore is 340 (feet) from the center of Antietam Street," and to that point the grade of the railroad was ascending for the distance of 100 feet "and from thereon the grade dips down." He further testified that he made tests to see how far down the track he could see when standing in the center of Antietam Street, and found that by standing 60 feet back from the near rail he could see down the track 44 feet; standing 40 feet back from the near rail, 76 feet; standing 20 feet back from the near rail, 310 feet, and 13 feet back from the near rail, 460 feet; that the pole from which the electric arc light hung is 14 feet west from the near rail, and the electric light about the same distance therefrom.

The evidence of the defendant shows that, at the time of the accident, there was an eastbound freight train on the siding next to the main track three hundred or four hundred feet south of Antietam Street, and at the same time there was an engine, which they called the helper or pusher engine, on the main track, the same track on which the engine and train that collided with the automobile was running. This engine had backed south through the town ahead of the last named engine, and was, at the time of the collision of the train and the automobile, about the same distance south of Antietam Street as the eastbound engine on the siding. Both of these engines were facing north, with their headlights located at the regular position on the front end at the top of the boiler, and were throwing the rays of their lights upon the southbound train, which collided with the plaintiff's automobile.

The defendant offered evidence tending to show that, with these conditions existing, the engineer on the southbound engine could not have seen, in crossing Antietam Street, an automobile fastened on the front of his engine, until he got within a short distance of the semaphore. But, upon cross-examination, one of his witnesses stated that "the headlights of the engines down the track would not prevent the engineer from seeing an automobile about to go on the track, as he was approaching Antietam Street, if the automobile was right under the arc light."

Leo Feagan, the engineer on the engine of the southbound train No. 1760, the one that collided with the plaintiff's automobile, testified that, when he crossed Antietam Street, he was going four to five miles an hour; the headlight was burning and the conductor was ringing the bell; the fireman and conductor were on the opposite side of the engine from him and "he was on the right-hand box seat watching ahead"; that he did not see Mr. Healey's automobile as he approached, or as he crossed Antietam; that the first he knew that there was any trouble was when he was about eight feet of the semaphore, when he thought he heard a noise behind him, and as

he turned his head around, he saw something at the side, that is at the front of his engine; that he threw on the emergency brake and stopped in about thirty or forty feet; that he did all he could to stop the train after he saw the automobile or that object on the front of the engine; that he was following a pusher engine through the town; that, as he crossed Antietam Street, the pusher was about five or six hundred feet ahead of him; that there was an eastbound train standing on the siding; that the headlights on both engines were burning bright; that they blinded him as he crossed Antietam Street, and after he crossed Antietam Street and until he got almost to the semaphore; that he did not hear any one signal to him as he was crossing Antietam Street; that just before he stopped he heard a noise which he judged was some one hollering; that there was in the cab of the engine, on the side he was sitting, the noise from the ejector which was working and makes quite a bit of noise, and also the noise from the air-pumps; that there was no unusual noise in the cab, "just about the same as is always made."

Upon cross-examination he testified that he followed the pusher or helper engine through the town at about the same distance behind it as when it passed Antietam Street; before reaching Antietam Street, he had crossed through streets with the pusher engine headlight shining towards him. "Q. What were you doing as you approached Antietam Street? A. Watching ahead. Q. Did you have your head out of the window? A. I had half of my head out of the window watching ahead. Q. Did you see anything as you crossed Washington Street? A. No, sir. Q. That was clear? A. Yes, sir. Q. Where was the pusher engine at that time? A. It was going ahead of me. Q. Did you keep on watching out as you went down Walnut Street? A. Yes, sir. Q. Did you see anything along there? A. No, sir. Q. When you got to Antietam Street, did you see anything there? A. No, sir; I did not."

He further testified that after crossing Antietam Street, he turned his head to the left to shut his eyes from the headlights of the engine facing him. "Q. Did you do that before you crossed Antietam Street or while you were crossing Antietam Street? A. While I was crossing Antietam Street. Q. You first said after you got across Antietam Street and now you say while you were crossing Antietam Street you turned your head, which is it? A. The front end of my engine was across the crossing. Q. I asked you if you took your head in, did you? A. I moved it in some." He never saw or heard anything until he got near the semaphore when he heard a noise and saw something out in front of the engine; he thought it was a buggy top; it was right in front of the cylinder on his side of the engine; he was then about eight feet from the semaphore; at that time he had passed the engine on the siding, although the pusher engine was ahead of him; he was then on a curve and the lights were not shining so much in his face as they had been. "Q. How near to where you sat, was this object which you saw out on your train? A. Just about 20 feet." Witness said he could see nothing when he crossed Antietam Street; the lights blinded him.

T. F. Price, the conductor, and William G. Price, the brakeman, were both recalled, and they testified as to the effect of the lights of the two engines ahead, stating that they prevented them from seeing objects ahead of them; that they blinded them; they also spoke of the noise of the ejector and the pumps.

The declaration, as originally filed, contained four counts and a fifth one was subsequently filed. The first, second and third were withdrawn, leaving only the fourth and fifth. Consequently the verdict was upon the fourth and fifth counts of the declaration.

The case was tried by a jury in the Circuit Court for Washington County and resulted in a verdict and judgment for the plaintiff, and the appeal is from that judgment.

The plaintiff offered three prayers, two of which, the first and third, were granted. The defendant offered twelve prayers. Of these the sixth, eighth, and twelfth were granted. The seventh and ninth were granted as modified by the court, while the first, second, third, fourth, fifth, tenth and eleventh prayers were rejected. The action of the court in granting the plaintiff's two prayers and the seventh and ninth prayers of the defendant, as modified, and its rejection of the defendant's first, second, third, fourth, fifth, tenth and eleventh prayers, constitute the third bill of exceptions. The other two exceptions, the first and second, relate to the action of the court in its rulings upon the evidence.

The negligence with which the defendant was charged, in the two counts upon which the verdict was rendered, was the failure of his agents and employees to stop the engine, carrying with it the plaintiff's automobile, before it reached the semaphore, and avoiding the collision of the automobile with the semaphore, which caused the injury complained of.

It was not to recover for any injury to the plaintiff or to his automobile, caused by its collision with the defendant's engine, that this suit was instituted. In fact, as far as the record discloses, there was no injury either to the plaintiff or to his automobile directly caused by its collision with the engine. But this action was brought to recover for the injury and loss sustained by the plaintiff, resulting from the collision of the automobile with the semaphore, which, as alleged by the plaintiff, the agents and employees of the defendant operating said train, by ordinary care and caution, could have avoided after they became, or by the use of ordinary care and caution could have become, aware of the perilous situation of the plaintiff, in which he was placed as a result of the collision of his automobile with the defendant's engine, caused in part at least by the negligence of the plaintiff.

It will thus be seen that, in the prosecution of this suit, the last clear chance doctrine is invoked. This Court, in *Md. Cent. R. Co.* v. *Newbeur*, 62 Md. 398, in defining this prin-

ciple or doctrine, said, speaking through CHIEF JUDGE ALVEY, that "where both parties by their negligence directly contribute to the production of the accident, neither has a right to recover of the other for injuries sustained thereby. · But there are exceptions to this general rule; and in cases like the present, the exception is, that if the defendant, or those acting for it, had become aware of the perilous situation of the plaintiff, though that peril had been incurred by the negligent or even reckless conduct of the plaintiff, yet the defendant or its agents would be bound to use all reasonable diligence to avoid the accident. But in order that this qualification of or exception to the general rule may be successfully invoked by the plaintiff, he must show knowledge, on the part of the defendant or its agents, of the peril in which he, the plaintiff, was placed, and that there was time after such knowledge, within which to make the effort to save him from the impending danger."

In the later case of *Consolidated Railroad Company* v. *Armstrong*, 92 Md. 554, where this doctrine was again invoked, and in which a prayer was granted by the lower court holding the defendant liable, if he by ordinary care and caution could have averted the accident after he became aware of the plaintiff's peril, or by ordinary care and caution *"ought to have become aware"* of his peril, the objection was made thereto, as in this case, that the insertion of the words *"by ordinary care and caution ought to have become aware"* was a modification of the doctrine as laid down in the *Neubeur Case;* but in discussing that objection, this Court, speaking through JUDGE SCHMUCKER, said: "There is no difference in principle between these two forms of instruction to the jury, for it cannot be seriously contended that when the defendant is in a position from which he ought to see or by the exercise of reasonable care could see the plaintiff's peril, he may avert his face or close his eyes and not see it and then escape liability for an injury resulting from such conduct on

his part.  As was said by this Court in *Cooney's Case*, 87
Md. 268:  'The law will not permit the loss of life or limb
or even property to be deliberately and carelessly inflicted,
when it could by reasonable care and caution be averted,
merely because the injured person was negligent.' "

This is no doubt the established law of this State, applic-
able to cases like the one before us.  *Lake Roland El. Rwy.*
v. *McKewen*, 80 Md. 593; *Balto. Trac. Co.* v. *Appel*, 80 Md.
603; *Consol. Rwy. Co.* v. *Rifcowitz*, 89 Md. 338; *United
Rwys.* v. *Kolken*, 114 Md. 160; *Silver* v. *Phila., B. & W. R.
Co.*, 120 Md. 65; and other cases.

The law as above stated was contained in the plaintiff's
first prayer and the defendant's seventh and ninth prayers,
as modified; and it appears to have been recognized by the
defendant in his eighth prayer, which was granted by the
court as offered.

The plaintiff's third prayer correctly states the measure of
damages.  The defendant's tenth prayer, which was rejected,
was properly rejected, as it was at variance with the principle
stated.  The defendant's eleventh prayer was likewise prop-
erly rejected.

The second prayer of the defendant, which asks that a ver-
dict be directed for him, because of the alleged contributory
negligence of the plaintiff, is based, as stated by the defend-
ant in his brief, upon the fact that the plaintiff did not blow
the horn of the automobile after it became attached to the
engine.  The court, upon the facts shown in this case, was
certainly not warranted in holding as a matter of law that the
plaintiff was guilty of contributory negligence in not blowing
the horn of his automobile at such time.

This brings us to the consideration of the defendant's first,
third, fourth and fifth prayers, each of which asks the court
to direct a verdict for the defendant because of a want of
legally sufficient evidence entitling the plaintiff to recover.

The plaintiff at the time of the accident was on one of the
public streets of Hagerstown, where he had a right to be, sub-

ject to the duty imposed upon him of exercising due care and caution in crossing the defendant's tracks thereon, and to see that his way was clear before attempting to cross or to approach so near thereto as to render his position unsafe in respect to passing trains; and the defendant had the right to cross said street with his trains, subject to the duty imposed upon those operating his trains of exercising ordinary care and caution in relation to those traveling on said public highway.

The evidence discloses that there was an arc light brightly burning on the south side of West Antietam Street, only a few feet from the track of the railroad of the defendant, and that when the automobile of the plaintiff stopped, the rear end of it was immediately under this light. A witness of the defendant testified that the lights upon the two engines in front of engine No. 1760 had the effect of blinding Feagan, the engineer thereon, after he got behind the rays of this arc light, but "until he came to this arc light, he could see right at the arc light, that the headlights of the engines down the track would not prevent the engineer from seeing an automobile about to go on the track, as he was approaching Antietam Street, if the automobile was right under the arc light."

This and other evidence in the case showing that those operating the train were both called and signalled to by persons near to the engine warning them of the danger and the perilous position of the plaintiff caused by the collision of the automobile with the engine, was sufficient to go to the jury, to be considered by it as tending to show that those operating the train, by ordinary care and caution, could have avoided the collision of the automobile, not with the engine, but with the semaphore, which caused the loss and injury sued for.

It may have been that, by the exercise of ordinary care and caution, the engineer, or those operating the southbound train, could not have avoided its collision with the automobile, but whether this be so or not, it was nevertheless the duty of those operating the train to have used ordinary care and caution in

crossing said street, and in so doing, as stated at least by one witness, a witness produced by the defendant, they could have seen the automobile of the plaintiff under the arc light near the track of the defendant, and seeing it there, though not able to avoid colliding with it, they would have known of the perilous situation of those in the automobile which was upon or dangerously near the track, and their attention being attracted thereto, the engineer would not, as he admits, while still crossing the street, have ceased looking ahead of him, but would naturally have continued to give his attention to the automobile, and in all probability would have seen it attached to his engine in time to have avoided the accident resulting in the injury complained of.

/ Evidence as to whether those operating the train used proper care and caution before and while crossing the street is admissible in this case, not to determine the liability of the defendant for the injury, if any, caused by the collision of the train with his automobile, for such question is not involved in this suit, but because such evidence aids in the determination of the further question whether the employees of the defendant, in the operation of his train, by proper care and caution could have avoided the collision of the automobile with the semaphore after they knew, or by reasonable care and caution could have known, of the perilous situation of the plaintiff caused by the collision of his automobile with the defendant's engine, and that such evidence is admissible for such purpose, we think there can be no doubt.

The remaining two exceptions relating to evidence were, we think, properly ruled upon by the learned court below, and as we find no error in the court's rulings upon any of the questions presented by this appeal, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*