Paul Kolish, aged four years, two months and seven days, on July 7th, 1924, was struck and killed by one of appellee's railway cars, as it was proceeding east along Portland Street near Emory Street, a public highway in Baltimore City.
On August 21st, 1924, this suit was brought in the Baltimore City Court under article 67, Bagby's Code, by John Kolish, father of Paul Kolish, to recover compensation for the loss which he suffered through the death of his son, which he alleged was caused by the wrongful acts, neglect and default of the appellee.
The case was in due course tried before the court and a jury, and the verdict and judgment being for the defendant the plaintiff appealed.
The only exception found in the record was taken to the action of the trial court in granting the defendant's first, third, sixth, and ninth prayers.
The defendant's first prayer submitted the proposition that the equitable plaintiff could not recover if his infant son failed "to use such care and caution as the jury may find that a reasonably prudent person of his age would have exercised under like circumstances, and that if the jury shall further find such failure contributed to the happening of the accident mentioned in the declaration." *Page 446 
Its third prayer instructed the jury that if the equitable plaintiff "failed to exercise such care as a reasonably prudent person would have exercised under like circumstances, in allowing his infant son, Paul Kolish, to be unattended upon the streets at the time of the accident, and that such failure to exercise such care contributed to the happening of the accident," he could not recover.
Its sixth prayer stated that if "Paul Kolish, the infant son of the equitable plaintiff, in attempting to cross the line of tracks of the defendant at or near the intersection of Portland and Emory Sreets, walked or ran into the side of one of the cars of the defendant, the verdict of the jury should be for the defendant."
Its ninth prayer instructed the jury that if they should find that Paul Kolish would not have been injured "if the mother of the said child had used reasonable diligence under all the circumstances to prevent the said child from being on the highway known as Portland Street without any one to guard him, and that such failure to guard and protect said child directly contributed to the happening of the accident," their verdict should be for the defendant.
These four prayers involve the hypothesis that if the negligence of the injured child or that of his father or mother directly contributed to the accident which caused his death, the equitable plaintiff cannot recover therefor. The appellant denies however that that conclusion is a necessary legal consequence of the fact that the negligence of the child or his parents directly contributed to the accident, because, he says, even if their negligence did contribute thereto, it would not bar a recovery, if the motorman operating defendant's car saw or, by the exercise of reasonable care, could have seen the child's peril resulting from such negligence in time, by the exercise of ordinary care, to have avoided striking him, but failed to do so.
The defendant in reply to that contention says, that there is no evidence in the case legally sufficient to show (a) that it was negligent at all, or (b) that its motorman saw or by *Page 447 
the exercise of ordinary care could have seen the child in time, by exercising ordinary care, to have avoided striking him, and that therefore, even if these four prayers were erroneously granted, the plaintiff was not injured because he was not entitled to recover in any event.
From this statement of the questions presented by the appeal, it is apparent that any review of the rulings of the lower court in respect to these prayers involves an examination and an analysis of the evidence relating to them.
The plaintiff offered two witnesses who actually saw the accident, Hyman Cohen, who was delivering soda water from a truck parked on the south side of Portland Street, and Ellsworth Marshall, a boy, who was, when the accident happened, some ten or eleven years of age.
Cohen testified that he had delivered some cases of soda water at 634 Portland Street, and was on his way back across Portland Street to his truck, when he saw one of defendant's cars bound east along Portland Street approaching, and while he stood in the west bound tracks waiting for it to go by, he saw it strike Paul Kolish; that it was going at that time about eighteen miles an hour, and that it struck him with the left side of the fender and carried him on "over Emory Street," that it struck him when it was at a point opposite the third house west of Emory Street and carried him to the third house east of Emory Street before it came to a stop; that the last time he saw Paul before the accident he was on the pavement where the witness served the soda water, and he did not know how he reached the place where he was hit by the car. On cross examination he testified that while he saw the car approaching he did not hear it; that the car hit the child, but whether the child was at that time stationary, or going towards the car, he did not know; that he was about seven or eight feet away from the child when he was struck, and was actually looking at him then, but that he had not noticed him in the street before that. He also gave this testimony: "Q. Do you know whether or not the car hit the child, or the child walked into the car? *Page 448 
A. Well, I believe the car — well, the car hit him, I have seen it, I have seen the car hit him. Q. But you don't know whether the child was walking into the car or not, do you? A. I have not seen him the way he comes to the car, I have not seen it. Q. You never saw that? A. No. * * * Q. But you do not know whether the child did not walk into the car or run into the car? The car struck the child."
Ellsworth Marshall gave in substance this testimony: He knew Paul Kolish. His little sister played with him. At the time of the accident he was sitting in a child's wagon on the north side of Portland Street, watching Paul at play. He saw him throw a ball across Portland Street, and go over after it. When he got it he threw it back across Portland Street, and started back himself. On his way back he dropped his sandal and he stopped and turned back and was hit by a car. The car was coming fast, "faster than they usually run" and he heard no bell, whistle or other signal of its approach. The fender of the car struck Paul, in "front on the left side of it." On cross examination he said that Paul's mother was not on the street but was in her house, and he then gave this testimony: "Then you saw this little Kolish child throw the ball across the street?" "Yes, sir." "And he went over and got the ball?" "Yes, sir." "And he came back, is that right?" "He threw it back, and then he run after it, and he dropped his sandal coming back." "Where did he drop his sandal, if you saw him?" "About a foot from the car track." "On which track, the inbound or the outbound?" "I mean a yard." "A yard from where?" "From the car track or street, either one; I mean the curb; I can not remember which it was now." "Which curb was it now?" "On the other side of the street." * * * "Which way was he coming, towards you or away when he was hit by the train?" "He was coming that way (indicating), and then he was going and I never heard a whistle or nothing, and then I seen him get hit by the train." "Outside of the whistling question, was he walking or running towards the car?" "No, the car was running towards him." "Did he stop?" *Page 449 
"Did Paul walk or run towards the car?" "He was running and the car was coming real fast." "Did he come in front of the car?" "Did the boy get in front of the car, or did he hit the side of the car?" "The boy never hit the car. The car hit him." * * * "The boy had not gotten into the track then?" "No, sir." "He had not?" "Yes, he was in the track, and then the fender caught him, the front fender." * * * "Where was little Paul when you first saw the car?" "He was just starting to run across and the car was coming real fast." "Did he get across for his sandal?" "No, sir." * * * * "And you think he got in front of the car before he was struck?" "Yes, sir." "In the track?" "Yes, sir." In addition to this testimony, John Kolish the father testified that he was away at work when the accident occurred and knew nothing of it until it had happened.
On behalf of the defendant, Edward J. Hesse, the motorman operating the car which struck the child, testified that he did not see him before the accident, and did not know that the car had struck him until he heard a colored boy scream; that he had a clear view ahead from his position on the right side of the car, and could also see on either side; that the child did not run in front of the car, that at the time he was going about eight miles an hour and that, although he could see the sidewalk on both sides of the street, he saw no children anywhere as he approached Emory Street, that he did not think he sounded the bell, because there "was nothing in the street to sound it for," that he did not see the little boy; he was not in front of the car and he did not know where he came from, and when the train came to a stop the front of it was about the middle of Emory Street.
Edward R. Burns, the conductor in charge of the car, was on the rear platform when the accident happened and saw nothing of it.
Joseph Bowness, at the time the accident occurred, was looking from the third story of 630 Portland Street, and he testified that he saw the child run into the street after a ball, and "right in the side of the car at the steps," and *Page 450 
that the train at the time was running about eight or nine miles an hour. Further testifying the witness said: "The train was almost in front of the saloon corner when the little boy ran off of the curb?" "The child was already in the street when he started to run." "Where was he in the street?" "He was between 632 and 634." "Not on the sidewalk, but in the street?" "Yes." "And while he was in the street there the train was coming along?" "Yes, sir." "That is correct, isn't it?" "Yes." "And then he ran out into the train?" "He ran right into the car."
John B. Wright, who also saw the accident from 630 Portland Street, gave this description of it: "Well, I saw the car coming east on Portland Street. I was sitting on the north side of the street. The boy ran across from the north side to the south, and he got about half way between the tracks, I think." "Which tracks?" "The eastbound track, and the car knocked him and flipped him over, you know, and I can not tell exactly whether the wheel ran over the child or not, the first wheel, but the body of the child was underneath of the train, and his head was sticking out on the other side of the wheel, and it drug it down the street." * * * "Do yon know what part of the car struck him?" "Well, I should say the left end, the left front end of it, right on the left side of the bumper." "Do you know whether the child walked or ran toward the car?" "He ran." "How fast was the car coming?" "I should think about twelve or fifteen miles."
Jacob Berlin, a passenger on the car, testified: "As near as I can recollect, it was on the corner I saw a store, and there was some woman and somebody else sitting there at the store. This child ran off the house next door to the store, not the store, there was somebody in the house, and the child ran right over right into the car. It just made me sick and I left. If he would not have gotten my name, I would not have been here now. * * * The car was going very slow. He had just come around the curve at Fremont Street, and he had just come around that curve. In my judgment there *Page 451 
was no way in the world that the motorman could have seen it. * * * The child ran right out of the house. It seemed as though he ran right ahead to his death. He run out of the house, off the porch, off of that little step and run right into it. Just, as you would say, he run to his death." * * * "How fast was the train going?" "Well, I would judge it was going about ten miles an hour." "Do you think the little boy was going about ten miles an hour?" "That I could not tell you, how fast the little child was running." "I know the thing happened in a second; that is all I can tell you. It happened so fast, before I could turn around."
In rebuttal Mrs. Kolish testified that when the accident happened she was not on the street; that she had left "him," presumably Paul, sitting on the steps, when she heard her little baby cry and had gone into the house, and that when she came back the accident had happened.
This is in substance all the evidence material to the issues in the case, and we will first consider it in connection with the contention that it did not furnish legally sufficient evidence of primary negligence on the part of the appellee.
Taking all the evidence tending to support the plaintiff's claim, together with such inferences as might naturally and legitimately be drawn therefrom, the jury, if they believed it to be true, would have been justified in finding that just prior to the accident the child was playing in the bed of Portland Street, running back and forth across it after a ball, that when he was struck by defendant's car it was running at about eighteen miles an hour, "very fast," "faster" than appellee's cars "usually run"; that he was at the time he was struck in front of it, and that it gave no warning by bell, whistle or other signal of its approach.
Abstractly, neither the speed of the car nor the failure to give reasonable audible warning of its approach was necessarily negligent, although it may have been so under the circumstances of this case. Negligence is relative and comparative (20 R.C.L. 25), and cannot be conceived apart from the circumstances accompanying the act with respect *Page 452 
to which it is asserted. As was said by Judge McSherry for this Court in Cooke v. Balto. Traction Co., 80 Md. 554;
"Negligence is essentially relative and comparative, not absolute. It is not even an object of simple apprehension apart from the circumstances out of which it grows. As these circumstances necessarily vary in their relations to each other, under different surroundings they inevitably change their original signification and import. Hence it is intrinsically true that those things which would not under one condition constitute negligence, would, on the other hand, under a different, though not necessarily an opposite condition, most unequivocally indicate its existence. Thus an act which would have been neutral or indifferent when street cars were drawn by horses at a comparatively low rate of speed, and could consequently be readily brought to a stop as occasion required, would become culpably negligent since the change of motive power and the great acceleration of speed incident thereto under the rapid transit system. The existence of negligence is therefore to be sought for in the facts and surroundings of each particular case." Again inUnited Rys. v. Watkins, 102 Md. 267, it was said: "Negligence, both primary and contributory, is essentially relative and comparative, and not absolute. Whether it exists or does not exist in either form in a given case, must necessarily depend upon the circumstances of that case. In every instance it must in the last analysis be some breach of the duty owed by one person to another; and as the duty, whose breach is relied on as actionable negligence, varies under different conditions, the conditions must be known before negligence can be predicated of any act producing an injury. * * * A street railway company has no exclusive right to the use of a public highway in a city for the movement of its cars and possesses no greater or superior right to use the street than is enjoyed by any individual apart from the mere franchise to lay its rails thereon. That franchise in no way exempts such a company from an imperative obligation to exercise due and proper care in propelling its cars to avoid *Page 453 
injuring persons who have an equal right to use the same street as a thoroughfare. Inasmuch as the right of the individual to use the street is co-extensive with the like right of the railway, each, as a consequence, owes to the other precisely the same duty to avoid an injury; and the railway company has no more right carelessly to run its cars along its tracks than the individual has carelessly to cross or traverse them." And in Schell v.United Railways, 144 Md. 531, this Court, through Judge Adkins, said: "Negligence is essentially relative and comparative and depends upon the circumstances out of which it grows. As these circumstances necessarily vary in their relation to each other, under different surroundings they inevitably change their original significance and import. Hence it is intrinsically true that those things which would not under one condition constitute negligence, would, on the other hand, under a different, though not necessarily an opposite condition, most unequivocally indicate its existence."
So that the question here is whether negligence can be inferred from the manner in which the appellee's agents operated its car under the circumstances surrounding the accident which is the basis of this case. And in considering that question regard must be had both to the character of the instrumentality causing the injury and the time and place where it occurred.
It was said in Cooke v. Balto. Traction Co., supra, in reference to the duty owed by a street railway company to pedestrians and others using the streets on which it operated its cars: "It is bound to take notice of, recognize and respect the rights of every pedestrian or other traveler, and if by adopting a motive power which has increased the speed of its cars, it has thereby increased, as common observation demonstrates, the risks and hazards of accidents to others, it must, as a reciprocal duty, enlarge to a commensurate extent the degree of vigilance and care necessary to avoid injuries which its own appliances have made more imminent." And in Baltimore City Pass. Ry. Co. v.McDonnell, *Page 454 43 Md. 553, referring to the same thing, the Court said: "In a large populous city, where all descriptions of vehicles are constantly passing and repassing, as well as persons on foot, including the aged and infirm, as also children who are young and wanting in prudence and discretion, it is the duty of drivers of cars not only to see that the railroad track is clear, but also to exercise a constant watchfulness for persons, who may be approaching the track. Unless he does so he does not exercise that ordinary care and prudence, which the law imposes upon him."
The appellee contends that there were but two facts on which a finding of negligence could conceivably have been based, the failure to sound a signal, and the speed of the car. But there was a third fact quite as important as either of these, which must necessarily have characterized and given color to them, and that was the alleged failure of the motorman to exercise reasonable care and vigilance to ascertain whether pedestrians, or others in the lawful use of the street, were likely to be imperilled by his operation of the car. Mere speed, or the failure to give a signal, considered in connection with actionable negligence in such a case as this, are only significant when they result in injury, and are only important when considered in connection with the failure of the person operating the car to ascertain the presence of persons who may be injured by it. What might be a reasonable and proper speed in the open country, or in a clear street on which there were at the time neither vehicles nor pedestrians, could be unreasonable and reckless in a city street on which men, women and little children were constantly travelling and crossing and recrossing. So that it is incumbent upon the operator of a street railway car to operate it at such a speed, to have it under such control, and to give such warning of its approach, as will enable him by the exercise of ordinary care under the circumstances existing at the time to avoid injury to others who may be also in the lawful use of the street. These are mere platitudes, paraphrasing a rule, universally recognized, which is thus *Page 455 
stated in 36 Cyc. 1577-1579: "A motorman, driver or gripman in charge of the operation of a street car is ordinarily bound to anticipate the presence of vehicles and pedestrians on the street or highway in front of or near his car, and it is his duty to keep a diligent lookout to avert injury to persons, animals, or vehicles on the track or approaching thereto, and this duty is particularly applicable at street crossings, and on streets in densely populated neighborhoods or on crowded streets, and is sometimes prescribed by statute or ordinance. * * * A street railroad company must operate its cars at such a rate of speed as under all the circumstances is reasonable and compatible with the lawful and customary use of the street or highway by pedestrians and vehicles; but in the absence of an express regulation limiting the rate of speed of street cars, the mere fact that a car is running at a rapid rate does not establish that it is being run in a negligent manner; but what rate of speed is reasonable and conversely what rate of speed is unreasonable and negligent is determined by the relation of the speed to the circumstances under which it is maintained, having regard to the view of the driver or motorman, the crowded condition of the street, and all other circumstances and conditions existing at the time, which may increase the danger of persons being on or near the track. In accordance with these rules, a motorman or driver must at all times so regulate the speed of his car as to have it under reasonable control, so as to be able to reduce the speed and if necessary stop the car when danger is imminent; and this rule is particularly applicable when the car is approaching a street crossing, or is being run on a crowded or densely populated street, or where there is a sign over the tracks requiring cars to run slow, although the speed need not be so regulated as to avoid injury to persons using the street or highway in an unreasonable and improper manner."
Applying these principles to the facts before us, in our opinion there was enough in the evidence to which we have referred to take the case to the jury. With the weight of *Page 456 
that evidence or the credibility of the witnesses furnishing it, as we have repeatedly stated, we have nothing to do, but assuming it to be true, it is difficult to understand why the motorman who was able to see both sides of the street ahead of and on each side of him was unable to see the little boy. The child obviously must have been in the street outside the tracks, or inside the tracks, near the front of the car, just before it struck him, for there is evidence that he was hit by the front fender, which is in front of the front steps, and he could scarcely have reached that position unless at some time before he came in contact with the car he could have been seen by the motorman had he been exercising the vigilance required of him under the circumstances. And for the motorman to have operated his car along a city street where small children were at play, at such a speed and without any warning of its approach, without constantly watching to see whether they were likely to be injured by such operation would, if found, have been at least some evidence of negligence.
We will therefore return to a consideration of the defendant's prayers referred to above. No serious objection was urged in this court to the first, third and ninth prayers as correct statements of abstract legal principles, but the appellant contends that they are faulty because they ignore evidence which supports the theory that the motorman could have avoided the accident after he saw, or by the exercise of ordinary care could have seen, the child's peril. But in our opinion there is no sound basis for that objection and the doctrine of the "last clear chance" does not apply to the facts of this case.
One of the earliest cases to apply that doctrine was Mann v.Davies, 10 M. W. 546. In that case a donkey with its forefeet fettered was left in a public way. It was struck and injured by a wagon coming down a slight decline at a "smartish" pace. The driver of the wagon was some little distance behind the horses. Conceding that it was negligent to leave the donkey in the road, Lord Abinger, C.B., *Page 457 
said: "As the defendant might, by proper care, have avoided injuring the animal, and did not, he is liable for the consequences of his negligence, though the animal may have been improperly there," and Parke, B., said: "All that is perfectly correct; for although the ass may have been wrongfully there still the defendant was bound to go along the road at such a pace as would be likely to prevent mischief. Were this not so, a man might justify the driving over goods left on a public highway, or even a man lying asleep there, or the purposely running against a carriage going on the wrong side of the road." The doctrine is engrafted on the defence of contributory negligence, and of late years there has been a tendency in some jurisdictions to so extend it as to practically abolish that defence. It is necessarily invoked to avoid the effect of the rule that where the negligence of both the plaintiff and defendant directly contributed to the happening of the accident complained of there can be no recovery. And it reaches that end by asserting that where the defendant discovered the plaintiff's peril in time to enable him by the exercise of ordinary care to avoid injuring him, and failed to do so, he is liable for the injury, notwithstanding that the defendant's position was due to his own negligence. Knowledge therefore on the part of the person causing the injury, superior to that of the injured person, is the ultimate basis of the doctrine, and it follows that time is an essential element thereof, because the doctrine is not applicable unless the defendant discovered the plaintiff's peril in time, by the exercise of ordinary care, to have avoided the accident. There is some conflict and some confusion as to whether that knowledge must be actual, or whether it may be constructive. But since the case of Consol. R. Co. v. Armstrong, 92 Md. 563, it has been the settled law of this state that constructive notice is sufficient.
That modification of the doctrine was fully discussed and deliberately adopted in that case, after careful consideration and an exhaustive review of the authorities, and it has been followed in all the cases since, including the recent cases of *Page 458 Payne v. Healey, 139 Md. 97, and Trenary v. United Rys. Co.,143 Md. 123.
We have said that there has been in some jurisdictions a tendency to so extend the doctrine as to abolish the defence of contributory negligence in cases of this character, but that is not the law of this state and the doctrine is not in our opinion applicable in any case where the defendant did not know and could not by ordinary care have learned of the defendant's peril in time to avoid injuring him, or where he should not, in the exercise of ordinary care, have anticipated that the plaintiff might place himself in peril. Or, as was said in Consol. Ry. v.Armstrong, supra: "This modification of the general doctrine of contributory negligence should not be constantly or indiscriminately used in instructing juries in suits for injuries caused by negligence, but its employment should be confined to those cases in which there is testimony placing the defendant or his agent in a situation affording him an opportunity to discover the plaintiff's peril, by the exercise of reasonable care, in time to avert it." See also 20 R.C.L. Par. 114 et seq.; 29Cyc. 530.
Applying these principles to the facts involved here, and assuming that the injured child was old enough to have been guilty of contributory negligence, in our judgment there is no evidence in the case legally sufficient to show that the motorman, after he could by the exercise of reasonable care have discovered his peril, could have avoided injuring him, and the prayers under consideration are not therefore defective because they failed to submit the theory of "last clear chance" to the jury. For there is literally no evidence from which the jury could have reasonably inferred that the motorman could have discovered the child's peril in time to have avoided the accident. From all that appears in the record the child may have been running away from the car an instant before it was struck, and turned towards it too late for the motorman to stop it, or he may have been in a place of safety on the pavement, or Cohen, who was in the west bound tracks, may have been between him and the motorman, or he *Page 459 
may have been so near Cohen that the motorman, if he had seen him, would have been justified in assuming that he was with Cohen and under his care, or he may have run towards the north sidewalk and immediately returned for his sandal and run into danger before the motorman could possibly have stopped his car. Under such circumstances any attempt to say that the motorman ought to have seen the child's peril in time to have avoided injuring him would be the merest speculation and guesswork. Because it does not follow that, since the motorman saw the child in the street or on the sidewalk, he was bound to anticipate that he would rush into danger, but it was necessary, to justify the application of the doctrine, not only that he saw the child but that he saw or ought to have seen that he was in peril, because manifestly a motorman operating a street car is not bound to reduce its speed whenever he sees a child in or near the street, unless there is some circumstance sufficient to warn a person of ordinary prudence that the child is or is likely to be endangered by the operation of the car. If on the other hand the child was not old enough to be guilty of contributory negligence, then the doctrine does not apply at all, for it cannot exist unless there is contributory as well as primary negligence. Keiper v. Pac. Gas Elec. Co., 36 Cal.App. 362; Wilson v. R.R. Co., 122 Va. 162;Henderson v. R.R. Co., 176 N.C. 488, 97 S.E. 388.
No objection was made in this Court to the legal propositions involved in the three prayers under consideration, and for that reason we do not deem it necessary to discuss them farther than to say that while the proposition submitted by the first prayer, that a child a little over four years old can be guilty of contributory negligence, is opposed to the great weight of authority (29 Cyc. 537; 17 A. E. Ann. Cas. 352; Ibid. 1913 B, 969), it finds support in the case of United Rwys. Co.v. Carneal, 110 Md. 211, where the Court stated that a plaintiff's prayer which instructed the jury that they should find for the plaintiff if they found from the evidence that she was injured by the defendant's *Page 460 
negligence, "unless they shall find that the injury complained of resulted from the want of such care and prudence on the part of the plaintiff as ought, under all the circumstances, to have been reasonably expected from one of her age and intelligence, or from the want of ordinary care and prudence on the part of her parents, directly contributing to the accident," was a correct statement of the law.
This brings us to a consideration of the defendant's sixth prayer, which asserts the proposition that if the injured child, in attempting to cross Portland Street, ran into the side of defendant's car, that the equitable plaintiff could not recover.
The theory embodied in that prayer is wholly erroneous and no apt authority was cited in support of it. It excluded from the consideration of the jury, if they believed the testimony supporting the plaintiff's claim, the fact that the motorman might have been aware of the presence of the child in the street just before it was struck, if he had exercised due care, and that notwithstanding such actual or constructive knowledge, he drove the car towards it at the rate of eighteen miles an hour without giving any warning whatever of his approach. In Northern CentralRwy. Co. v. Burns, 54 Md. 112, and Balto. O.R.R. Co. v.Block, 107 Md. 642, cited by appellee, the evidence failed to show that the defendants could have seen the injured persons by the exercise of ordinary vigilance in time to avoid injury to them, and in Balto. City Passenger Ry. v. Cooney, 87 Md. 261, the Court was dealing with the proposition that a boy eleven years old, who left a place of safety to run in front of a street car too late for it to avoid striking him, could not recover for the injuries he suffered from the accident. If a person suijuris, and in the possession of his normal faculties, deliberately walks into the side of a rapidly moving car, his conduct may well be regarded as negligence in law, but this is not that case. Here we are dealing with the conduct of a child four years and two months old, and we cannot assume as a matter of law that he could have run after and *Page 461 
overtaken a car travelling at the rate of eighteen miles an hour, and have run into the left front step or the left of the front fender, without being at any time within the range of the motorman's vision; nor can we assume as a matter of law that a child of that age was guilty of contributory negligence merely because he collided with the side of the car. It was a fact which the jury were entitled to consider in connection with all the other circumstances surrounding the happening of the accident, in determining whether the child was guilty of contributory negligence, but it certainly could not be more than that. In 29Cyc. 5538, it is said that "practically" no cases had been found which held that a child under six years of age, could be charged with negligence, and while, as we have stated, that is not strictly accurate, we know of no cases which would justify us in holding that such an act on the part of a child a little over four years old raised a conclusive presumption of negligence, There was therefore error in granting this prayer, and in our opinion the error was injurious, and because of the concurrence of error and injury it follows that the judgment appealed from must be reversed.
Judgment reversed, with costs, and case remanded for a newtrial.