**Jose ORTIZ**

v.

**GREYHOUND CORPORATION and
Frank Robert Liberati.**

**No. 10312.**

United States District Court
D. Maryland,
Civil Division.
July 10, 1959.

Bernard M. Goldstein, Holniker & Wolf, Baltimore, Md., for plaintiff.

Rollins, Smalkin, Weston & Andrew, Thomas G. Andrew, Baltimore, Md., for defendant.

CHESNUT, District Judge.

In this case the plaintiff sued the defendants to recover damages for accidental injuries occurring to the plaintiff at the bus terminal of the defendant, Greyhound Corporation, in Baltimore. As a result of the trial the jury found a verdict for the plaintiff in the amount of $5,000. The defendants having moved for a directed verdict at the trial, have now moved for a judgment n.o.v., not including an alternative motion for a new trial. The jurisdiction of the court was based solely on diversity of citizenship. The Maryland law is, therefore, controlling. The motion has been fully argued by the respective parties and the matter has been considered by the court. My conclusion is that, based on the decisions of the Maryland Court of Appeals, the motion must be and it is hereby *granted*.

The trial of the case developed the following factual situations:

1. The plaintiff, 67 years of age, came to the United States from Puerto Rico in 1940. He speaks Spanish apparently fluently but does not speak English and was able to testify in court only through an interpreter. He is entirely blind in

one eye and has very little vision in the other eye. He had had no regular employment for three years prior to the accident. He is married and has a wife living in New York but he has been living in Baltimore with one or the other of two daughters. Prior to the accident he had on some occasions travelled by bus from Baltimore to New York to visit his wife, and had returned to Baltimore. He was apparently the recipient of an old-age pension.

2. On the day of the accident, October 5, 1957, he was in New York where he had gone to visit his wife. During the day a relative in New York telephoned his daughter in Baltimore that her father would be returning to Baltimore by bus and she was to meet him at the Greyhound bus terminal; but the daughter was not informed either of the hour of departure of the bus from New York or the hour of its arrival in Baltimore. The bus did in fact arrive at the bus terminal in Baltimore at 7:25 P. M., that day and the plaintiff alighted in safety from the bus to the platform. About two hours later the plaintiff was found under or about the left rear wheel of another bus at the terminal severely injured. He was taken to the hospital where he received treatment for about two months, and was then taken to the daughter's home. No one saw the plaintiff immediately before the accident or how it occurred. The plaintiff himself said that he did not know how or why or under what circumstances he came to be injured.

3. The plaintiff's daughter came to the bus terminal about 6:00 o'clock to meet her father but not finding him did not remain at that time. She went away and returned an hour or so later but still not finding her father and not finding it convenient to wait, again went away and when she returned a third time the accident had occurred.

4. No notice of any kind was given to the bus company in New York or Baltimore by the plaintiff's relatives that he was a handicapped person or otherwise required special attention as a passenger.

5. The baggage man, one Rush, called as a witness by the plaintiff, met the arrival of the bus from New York and noticed the plaintiff among the passengers who alighted from the bus. He saw the plaintiff looking at the bags which had been taken from the bus as if seeking his own bag. Other than seeing the plaintiff alight with other passengers he paid no particular attention to him as he was then busy with the bags generally. Later he saw the plaintiff in the waiting room at the terminal sitting on a bench and "playing with his umbrella".

6. Cahill, the janitor at the terminal station, saw a lady apparently talking or attempting to talk to the plaintiff after he had alighted on the platform. At her suggestion Cahill took the plaintiff into the adjoining waiting room and seated him on a bench. He called the despatcher's attention to the plaintiff, and shortly thereafter he saw two police officers (apparently called by the despatcher) in conversation with the plaintiff and he, Cahill, understood they had said the plaintiff was all right as he was waiting for his daughter to come and get him. Cahill did not see the plaintiff again until after the accident.

7. About ten minutes before the accident another witness called by the plaintiff, one Smith, a bus driver for the defendant bus company, who happened to be at the terminal not on duty of any kind at the time but waiting or anticipating orders to take out a bus, saw a man (whom he identified after the accident as the plaintiff) standing or walking in a private driveway of the bus company adjoining the terminal leading to Center Street, but paid no particular attention to him as his observation of him was entirely casual and while in conversation with other bus drivers.

8. The accident to the plaintiff occurred while a bus destined to go to Washington, D. C., was backing out from stall No. 8 adjoining the platform. It was not the bus on which the plaintiff had arrived as a passenger from New York. The driver of this bus for Washington, named Liberati, one of the de-

fendants in the case (whose testimony was not contradicted) testified that in order to start the bus on its way to Washington it was necessary to back out a short distance from the platform into the private driveway so that the bus could be directly headed toward the Center Street exit, and that after his passengers had all entered the bus from the platform he pursued the usual custom before backing by looking into his mirror by the driver's seat to see that there was nothing in the rear and starting the motor in the rear of the bus before putting the transmission in gear to start backing. The notice of starting the bus is very considerable. The first notice to any one of a possible accident was that another bus driver standing on or near the platform who happened to look to the rear of the bus, saw a man's foot or shoe sticking out from under the rear left wheel, and immediately pounded on the window of the bus to attract the driver's attention, which he succeeded in doing, and the bus immediately stopped.

9. It appeared from the medical evidence that the plaintiff's injury had been due to a portion of the rear wheel passing over the plaintiff's leg and pinching or extruding the skin and some of the flesh from the leg from the knee to the hip. The exact point or place where the plaintiff was so injured was fixed by a traffic officer, who shortly arrived on the scene, and who found bits of clothing or flesh indicating the point of impact, at approximately 42 feet from the front of the stall where the front end of the bus had been before backing. The bus is 40 feet long. The place where Smith had seen the plaintiff about ten minutes before the accident was approximately 80 feet from stall No. 8.

10. The place where the plaintiff was injured was not a part of the bus terminal designed or used by or for bus passengers. It was a part of a driveway for buses entering the terminal from Howard Street and leaving on Center Street. It is important to understand precisely the nature, location and size of the terminal. The driveway for the buses is in a private area or lane with cement paving and surrounding the bus terminal building or waiting room which fronts about 150 feet on Howard Street with a depth of about 110 feet on Center Street. This is a substantial structure bordered on the north and east sides of the building by a platform about 12 feet wide running the entire length of the north and east sides, with two or more entrances from the platform into the waiting room, which is equipped with benches for passengers, with telephone booths, with a lunch counter or restaurant and an office for the despatcher, ticket office, etc. The entrance for the buses is from Howard Street along the north side of the station connecting with a similar lane on the east side of the building on Center Street. The whole of it is a private driveway and is not a public street or public way. It is devoted to the use of the defendant bus company in the operation of its buses to and from the terminal.

The platform along the east side of the building has stations or stalls with a bumper or barrier at the edge of the platform arranged in a "sawtooth" fashion, so that the buses in arriving at the platform can be nosed into the sawtooth opening at an angle of about 45 degrees to the platform so that the passengers alight from the right hand front door of the bus directly onto the 12-foot platform and from there customarily enter the waiting room by an adjacent doorway. When a bus is ready to start on an outbound trip it is necessary, on account of the restricted width of the area, to back out from the stall a short distance before it can be guided directly into the exit on Center Street. The bus that was backing at the time of the plaintiff's injury was from stall No. 8.

11. On the east of the driveway leading to Center Street is a substantial garage used by the defendant bus company. The width of the driveway between the two buildings is about 60 feet. There are lights along the platform on the west and along the garage on the east of the driveway. Center Street and Howard Street

are well known public streets in Baltimore City.

12. The plaintiff testified through an interpreter only. While apparently speaking Spanish fluently he apparently could not speak English and his testimony both on direct and cross-examination were thereby more limited than usual. He was entirely unable to give any explanation as to how the accident occurred. Apparently the only thing he could remember was that when he alighted on the platform and was not met by his daughter he walked up and down on the platform for two hours until the accident occurred. Impliedly perhaps his testimony was to the effect that he did not in fact go into the waiting room although there was otherwise uncontradicted and quite credible evidence by at least two witnesses, one called by the plaintiff and one by the defendant, that they respectively saw him seated in the waiting room. No explanation was made or volunteered by the plaintiff as to why he could give no information whatever as to how he happened to be in the defendant's private driveway at the time of his injury. The platform was 12 feet wide and about 6 to 8 inches higher than the concrete surface of the driveway. There was no evidence that the plaintiff was non compos or had defective hearing; and travel by bus from New York to Baltimore was not a novelty to him. I think the only reasonable conclusion from all the evidence, both plaintiff's and defendants', was that after the plaintiff had alighted safely on the platform and had been escorted by the bus company's janitor into the waiting room to await the arrival of his daughter, he must have become impatient at her delay in arriving and wandered out of the waiting room and into the driveway and had become confused by his almost total blindness and walked into or very near the rear end of the bus as it was about to start. I think the plaintiff did say in response to a question that he did not notice or did not remember the noise from the starting bus.

The most significant facts in the case are (1) the accident to the plaintiff occurred two hours after he, as a passenger, had arrived and landed safely at the bus terminal in Baltimore; (2) his accidental injury occurred at a place not provided for or used by passengers but in a private driveway used by the defendant for the operation of its buses on arrival and departure from the terminal; and (3) no one saw or knew that the plaintiff was in a dangerous position before his injury.

I regret the necessity of granting the defendants' motion in this case. The distressing accident to this handicapped plaintiff naturally evokes sympathy from any one, including possibly the jury in this case. The amount of the verdict for the plaintiff was comparatively small. The medical and hospital charges for his care and surgery exceeded $3,500, and his injuries entailed long and painful treatment. The amount of the verdict, $5,000, could well be considered very inadequate compensation if there was culpable negligence on the part of the defendants; but under the well established law which is here controlling, I conclude that the whole evidence of the plaintiff has shown no breach of any duty by the defendants.

 The law with respect to the duty and care for its passengers by a common carrier is well settled. During the carriage and until the passenger has safely landed at destination the carrier owes him the highest degree of care consistent with the nature of the carriage; and this continues until the passenger has had a reasonable time to depart. But where the passenger has safely arrived at a terminal station, which is in itself safe and commodious, but where the passenger for his convenience or awaiting the arrival of some one to meet him wishes to stay at the station for a considerable time after a reasonable opportunity to depart, the carrier is no longer required to exercise the maximum degree of care but only ordinary and reasonable care for him. Chesapeake & O. Ry. Co. v.

Burton, 4 Cir., 1931, 50 F.2d 730, at page 731 (opinion by Circuit Judge Soper), certiorari denied 288 U.S. 617, 53 S.Ct. 507, 77 L.Ed. 990; and to the same effect see Chesapeake & O. Ry. Co. v. Burton, 4 Cir., 62 F.2d 110, 88 A.L.R. 756, and White v. Sears, Roebuck & Co., 4 Cir., 1957, 242 F.2d 821, at page 824; Elliott on Railroads, 3d. Ed. Vol. 5, ss. 2404 and 2411; 13 C.J.S. Carriers § 565, p. 1073; 10 Am.Juris. p. 53, ss. 1004 and 1005, Carriers; 42 A.L.R.2d at page 1192; Louisville & N. R. Co. v. Bays' Adm'r, 142 Ky. 400, 134 S.W. 450, 34 L.R.A., N.S., 678.

■ While it was reasonable and proper for the plaintiff to wait at the terminal for the arrival of his daughter, there was no evidence of any lack of safety in the waiting room provided for the accommodation of passengers awaiting the arrival of some one to meet them; nor was there any lack of safety or any defect in the platform on which the plaintiff stated he was waiting. As the accident did not occur either in the waiting room or on the platform, there is no question raised as to whether the defendant failed to exercise ordinary and reasonable care with regard to the plaintiff during the time he was waiting, either in the waiting room or on the platform. The plaintiff is entitled to have the motion considered in the light of the evidence most favorable to him. The great preponderance of the evidence is that after the plaintiff alighted on the platform, he went into the waiting room and remained there a considerable period of time before the accident. However, the plaintiff seemed to say, in effect, that he remained continuously on the platform, walking up and down waiting for his daughter. As the plaintiff has no recollection of how the accident occurred it is inferable that he forgot that he had gone into the waiting room. I doubt that a reasonable man could say that there was substantial evidence against the unimpeached testimony of the two witnesses, Rush and Cahill, that the plaintiff was seated in the waiting room. But however that may be, I think there is no material legal difference whether the plaintiff wandered from the waiting room to the private driveway or more directly from the platform. In either case he departed from the place provided for passengers into an area of the defendant's premises to which he had no invitation, either express or implied, to go. In doing so he was not in any sense an invitee, but at most a bare licensee.

The duty of a landowner to the plaintiff in that category was fully and carefully reviewed in 1949 in an opinion by Circuit Judge Soper in Duff v. United States, 4 Cir., 171 F.2d 846, affirming an opinion of this court, where the controlling consideration was the Maryland decisions. In that case a young boy residing near the Bainbridge Naval Training Station, was temporarily admitted to the premises by a friendly guard at the gate, and while there was injured by the purely accidental discharge of a pistol which another guard nearby was unloading. The status of the plaintiff was that of a pure licensee and it was held that the defendant United States was not liable for the accident. In short summary, it was stated in the opinion at page 850:

"Generally speaking, the owner of land in Maryland owes no duty with respect to the condition of his land to a trespasser, or even to a licensee, whose presence upon the land is known to him, except to abstain from wilful and wanton misconduct. Benson v. Baltimore Traction Co., 77 Md. 535, 26 A. 973, 20 L.R.A. 714, 39 Am.St.Rep. 436. The owner owes no duty to the trespasser or licensee to keep the premises safe or to anticipate his presence and warn him, and the trespasser or licensee acquires no right of recovery except in the case of wilful injury."

The difference between the Maryland law and that of some other jurisdictions was expressly noted in Judge Soper's opinion where he said, 171 F.2d at page 850:

"In many, perhaps the majority of jurisdictions, this rule is looked upon as too severe and it is suggested that it is more consonant with humanity and with

the uniform development of the law of torts to impose upon the property owner in all cases, where the presence of the trespasser is known, the duty to exercise a degree of care for his safety, such as a reasonable man would exercise under like circumstances; and it is said that this view does not unduly favor the intruder since the circumstances under which he is found upon the premises form part of the environment by which the judgment and conduct of the reasonable man are determined, and that whatever blame attaches to the trespasser, the owner's duty is merely to take the last clear chance to avoid unnecessary injury to his fellow man. See Peaslee, Duty to Seen Trespassers, 27 Harvard Law Review, 403.

"However persuasive this argument may appear to be, it has not been accepted in this state. Although Maryland, in applying the doctrine of the last clear chance in negligence cases, holds that constructive notice of the plaintiff's peril is sufficient to establish the defendant's liability, State [to Use of Kolish] v. Washington, B. & A. Electric R. Co., 149 Md. 443, 131 A. 822, it departs from this position when the plaintiff is a trespasser or licensee and requires *actual notice of the plaintiff's danger*." (Italics supplied.)

The Maryland decisions since 1949 have not departed from this view. In one of the most recent decisions on the same subject, Levine v. Miller, 218 Md. 74, 145 A.2d 418, 421, in an opinion by Judge Hammond, it is said:

"The Maryland law is firmly established that the owner of land owes no duty to a trespasser or licensee, even one of tender years, except to abstain from wilful and wanton misconduct and entrapment."

And again in the opinion it is said:

"Maryland cases are in agreement as to the general principle underlying the rule as to the change of status, geographical or chronological, of one who starts as an invitee."

"One may be an invitee or business visitor as to one portion of the premises, or for a limited time, and be a licensee or trespasser as to another portion of the same premises or, without changing location, undergo the same change in status by the lapse of time."

As pointed out by Judge Hammond above, the Maryland decisions recognize clearly that with respect to different portions of business premises the status of a customer as a business invitee may change where he goes to a portion of the premises not designed for customers. This was earlier illustrated in the case of Pellicot v. Keene, 181 Md. 135, 28 A.2d 826, where a small boy accompanied by his mother went to a grocery store, strayed behind a counter where customers were not invited, and was accidentally injured by falling through a trapdoor.

The instant case here is similar in principle and not unlike on the facts to the earlier Maryland case of Jackson v. Pennsylvania R. Co., 1939, 176 Md. 1, 3 A.2d 719, 120 A.L.R. 1068 and where it was held that the defendant railroad was not liable for injuries to the plaintiff, a trespasser on its tracks, where a train backing without lights or other warning, struck and injured the plaintiff.

On the facts it is abundantly clear, and indeed there is no contention to the contrary, that the injury to the plaintiff was not wilful or intentional, but purely accidental. It results under the Maryland decisions that the defendants violated no duty to the plaintiff.

Even if I could in this particular case treat the plaintiff at the time and place of his injury as a business invitee, still entitled to the exercise of ordinary and reasonable care by the defendant, still there is no evidence in this case to show that there was any negligence on the part of the bus driver, Liberati, in backing the bus. In the ordinary routine act of backing the bus, he had no reason to anticipate or suspect that the plaintiff was to the rear of the bus and after exercising the usual routine procedure in backing, he did not see and could not have seen the plaintiff to the

rear of the bus, the back of which was too high to permit the plaintiff if standing directly behind the bus, to have been seen. This evidence was uncontradicted.

For these reasons I have felt constrained to hold that under the Maryland law which is here controlling, the motion for judgment for the defendants, n. o. v., must be and it is hereby granted.