Rosa Julia Miranda, conocida también por Lila Miranda, demandante y apelada, *v.* Porto Rico Railway, Light & Power Co., demandada y apelante.

No. 4684.—*Sometido:* Noviembre 19, 1929. *Resuelto:* Julio 24, 1931.

720

*J. H. Brown, C. Ruiz Nazario* y *G. E. González,* abogados de la apelante; *Guerra-Mondragón & Soldevila,* abogados de la apelada.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

La presente es una acción por daños personales que se alega fueron causados por la negligencia de la demandada en el funcionamiento de uno de sus tranvías. La historia anterior de este caso puede hallarse en *Miranda* v. *Porto Rico Railway, Light & Power Co.,* 31 D.P.R. 778, donde se revocó una sentencia a favor de la demandante. La demandada apela ahora de una segunda sentencia favorable a la actora. El presente recurso envuelve la doctrina de última oportunidad expedita (*last clear chance*).

El accidente ocurrió dentro del municipio de San Juan, hacia mediados del trayecto comprendido entre las paradas 19 y 20 de la línea de tranvías de la demandada, en una sección densamente poblada. La distancia entre estas dos paradas era corta. La 19 se hallaba frente a la Escuela de Beneficencia para Niños; la 20, en la esquina formada por la calle del Hipódromo y la Avenida Ponce de León. Había una aguja en la parada 19. Contigua a la Escuela de Beneficencia se hallaba una capilla. Más allá de ésta había un solar yermo. Entre este solar y la esquina de la parada 20 había

cuatro casas, una de ellas en la esquina. Frente a las dos casas más próximas a la capilla había un verja. Entre la verja y la porción transitada de la Avenida Ponce de León se extendían los rieles de la corporación demandada.

No había aceras. Por más de un cuarto de siglo los viandantes habían utilizado una vereda entre la verja y la vía de los carros eléctricos para ir de una parada a la otra, y para entrar y salir de la capilla y de las casas entre la capilla y la esquina de la calle. La estrecha vereda entre la vía y la verja no tenía más de un metro de ancho. Un testigo dijo que no tenía más de 45 ó 50 centímetros. No consta qué parte de este espacio intermedio era ocupada por los tranvías al pasar, ni cuánto quedaba entre los lados de tales tranvías y la verja. No puede haber duda alguna acerca del carácter peligroso del lugar.

La casa y la verja más cercanas a la capilla pueden designarse, por conveniencia, como la casa y la verja de los Barletta. Como a las ocho de la mañana, la demandante salió de la casa de los Barletta, cruzó el portón del frente, y, sin mirar a su derecha hacia la parada 20, giró a la izquierda hacia la 19, y caminó por la vereda entre la verja de los Barletta y la vía. En o cerca de la esquina de la verja de los Barletta, un carro eléctrico la golpeó por detrás. A pocos pies del sitio había un poste mostrando un letrero que exhortaba a los motoristas a reducir la velocidad.

La vía entre la parada 20 y el sitio del suceso era recta, y la vista no quedaba obstruída. Cuando la demandante pasó por el portón y entró en la estrecha vereda entre la verja y la vía, el carro eléctrico, según un testigo, Vergne de la Concha, estaba sólo a cinco o seis metros de distancia. En una declaración prestada ante el fiscal de distrito poco después de ocurrir el accidente, el mismo testigo dijo que esta distancia era como dos veces el largo del tranvía. La corriente eléctrica había sido desconectada, y el carro marchaba lentamente cuesta abajo, aunque un poco más aprisa, según otro

testigo, que el paso de un hombre. El motorista no vió a la demandante antes de ella ser arrollada por el tranvía. No tocó la campana ni dió ningún otro aviso, ni hizo esfuerzo alguno por detener el carro hasta después de ocurrida la desgracia. No le fué posible dar explicación alguna respecto a cómo había ocurrido el percance. El carro pudo haber sido detenido en cualquier momento como a una distancia de un metro, o, tal cual estimó un testigo, dentro de una vara. No fué detenido hasta después que las cuatro ruedas del lado izquierdo habían pasado sobre la pierna derecha de la demandante, y hasta después que el conductor y un inspector que iban parados en la plataforma trasera, al mirar hacia atrás por una ventana de la parte posterior del vehículo, habían visto a la demandante en el suelo, y hasta después que el inspector había dado señales al motorista. La distancia entre el lugar en que yacía la demandante y la plataforma posterior del carro fué calculada por el conductor y el inspector en tres o cuatro metros, por otro testigo en ocho o diez, y por otros en quince o veinte.

Pedro Vergne de la Concha declaró que estaba sentado en el segundo asiento delantero al lado izquierdo del carro y que vió a la demandante cuando pasó por el portón y giró hacia la vereda que hay entre la vía y la verja de la casa de los Barletta; que ella caminaba muy cerca a la verja; que el testigo no la vió cuando fué arrollada por el tranvía; que no se tocó campana; que el sitio era peligroso, muy estrecho; que al carro le habría sido posible pasar a la demandante si ella hubiese estado pegada a la verja; que el sitio es peligroso, pero no al extremo de que fuera inevitable causar daño a una persona al pasar; que a fin de evitar el accidente era necesario dar aviso; que cuando el testigo y otras personas oyeron a la joven gritar, ellos llamaron al motorista y éste detuvo el carro como a 5 ó 6 metros de distancia.

Durante el examen de repreguntas, este testigo (un ex-em-

pleado de la demandada) dijo que el carro estaba como a 5 ó 6 metros de distancia del portón cuando la demandante pasó por éste; que ella miraba hacia adelante; que cuando ella pasó por el portón no miró hacia el carro; que ella tenía la espalda hacia el testigo y él no vió si ella miró en dirección del carro; que el testigo no creyó que un accidente fuera a ocurrir porque la demandante ''iba bien.'' Interrogado si dado el sitio por que ella caminaba el carro pudo haber pasado sin tocarla, el testigo repuso: ''Yo creo que sí. Es un sitio bastante estrecho, peligroso, pero se puede evitar un accidente.'' La pregunta siguiente fué: ''¿Pero usted creyó que no había peligro?; y el testigo contestó: ''Es costumbre al pasar por aquel sitio tocar la campana para avisar, porque es muy estrecho, y una persona que se descuide un poco puede sufrir un accidente.'' Interrogado nuevamente si él creía que la demandante estaba en una situación de peligro, contestó que el sitio era de por sí peligroso porque era estrecho.

La propia demandante, en la repregunta, después de manifestar que la vereda era estrecha, admitió que uno podía permanecer allí sin ser tocado por un carro en movimiento.

En el primer juicio la representación legal de la demandante se mantuvo afanosa en demostrar que si bien el sitio era peligroso, no obstante, de haberse tocado campana, la demandante habría podido eludir el daño. Esta actitud puede o no explicar en algo las admisiones hechas por la actora en la repregunta. En el segundo juicio, la transcripción taquigráfica utilizada para la primera apelación fué introducida en evidencia, y sólo una persona fué llevada a la silla testifical. Es digno de notarse que, no embargante la forma en que el caso fué juzgado en dos ocasiones, se establecieran tan bien hechos suficientes para colocarlo dentro de la doctrina de última oportunidad franca. América Barletta declaró en el primer juicio que la distancia entre el escalón de enfrente de su casa y el portón era como de dos metros,

y que el ancho del trecho entre la vía y la verja era menos de la mitad de esa distancia. En el segundo juicio, el nuevo testigo declaró que ese espacio no era menos de medio metro de ancho. Su testimonio no ha sido directamente contradicho por el de ningún otro testigo. No hay prueba acerca de cuánto de este espacio era ocupado por la parte del tranvía que se proyectaba fuera de los rieles.

De ser cierto el testimonio del testigo que prestó declaración en el segundo juicio, el trecho libre entre el lado de un carro en marcha y la verja sería poco menos de veinte pulgadas, aun si el carro no fuera más ancho que el espacio entre los carriles. Si, según estimó la Srta. Barletta, el espacio entre la verja y la vía era poco menos de un metro de ancho, y si aproximadamente la mitad de ese espacio era ocupada por la parte del carro que sobresalía de los railes, el resultado sería el mismo. Esto "daría margen a la doctrina de última oportunidad expedita." *Starck* v. *Pacific Electric Ry. Co.,* 172 Cal. 277.

Nuestro fallo, sin embargo, no depende de una prótasis tan inestable como la envuelta en un cálculo para la parte del tranvía que se proyectaba fuera de los carriles. No incumbía a la demandante "demostrar que su inhabilidad de zafarse del peligro que la amenazaba era un imposibilidad física." *Darling* v. *Pacific Electric Ry. Co.,* 197 Cal. 702, 707.

En *State* v. *United Rwys.,* 143 Md. 112, varias personas estaban paradas en la carretera entre un ómnibus y la vía. Una de las personas del grupo, que estaba parada de espaldas a la vía, fué arrollada por un carro que pasaba. ". . . Si el espacio entre el automóvil y las vías era tan estrecho como algunos de los testigos declararon, entonces solamente tenía cinco pies de ancho, y de ese espacio como un pie y medio era ocupado por la parte que sobresalía del carro, dejando una zona de relativa seguridad de sólo tres pies y medio de ancho." Se declaró que la prueba era insuficiente para de-

mostrar como cuestión de derecho que la negligencia del interfecto fué la causa próxima del accidente.

En el caso de *Chunn* v. *City and Suburban Ry. Co.,* 207 U. S. 302,

"La distancia entre los rieles interiores de las dos vías era 7 pies 10 pulgadas. Los escalones del carro sobresalían dos pies dos pulgadas fuera de las vías, dejando, cuando dos carros se cruzaban en aquel lugar, un espacio libre entre ellos de tres pies seis pulgadas, de manera que, según dijo uno de los testigos de la demandante, 'había bastante espacio para pararse si uno pensaba en lo que estaba haciendo . . .'

"Se trataba de un lugar que por sí mismo era perfectamente seguro, a menos que fuese hecho inseguro por la forma en que la demandada usara la vía al este para pasar los carros."

La corte dijo:

"Había espacio para pararse entre los dos carros, y evitar tener contacto con uno u otro. Pero el margen de seguridad era estrecho y dejaba poco espacio para las flaquezas humanas . . . . El mismo testigo (quien también estaba parado en la plataforma entre las dos vías) que dijo que 'había bastante espacio para pararse si uno pensaba en lo que estaba haciendo', dijo además: 'Yo me dí cuenta de que tenía que permanecer estrictamente en el centro de las dos vías . . . .' Los tres pies seis pulgadas de ancho del espacio de la plataforma desocupada no pueden lógicamente ser considerados sin tener en cuenta los peligros que plagaban los bordes a cada lado. Una plataforma lo suficientemente ancha para que un niño camine con seguridad desde la base del monumento a Wáshington hasta la escalinata del Capitolio, si se elevara en forma tal que se extendiera desde la cúspide del primero hasta la cúpula del segundo, pondría en peligro el paso del hombre que mejor dominio de sus nervios tenga."

La corte resolvió que la demandante, como cuestión de derecho, no era culpable de negligencia. Expresó, además:

"Tampoco es claro que aun si la demandante no estuviese exenta de culpa su negligencia fuera la causa próxima del daño. Si ella descuidadamente se colocó en una posición que la exponía al peligro y tal posición fué descubierta por la demandada a tiempo para haber podido evitar el percance, ejerciendo la debida prudencia y la de-

mandada dejó de ejercer tal prudencia, podría declararse que esa falta es la única causa del daño resultante.''

■ Ciertas disposiciones de la franquicia de la demandada parecen hacer distinción entre la servidumbre de vía de la demandada, o su actual servidumbre de paso, y la servidumbre de vía privada de la demandada, o su presente servidumbre de paso privada. Otras disposiciones indican la existencia de una servidumbre de paso sobre una carretera pública, e imponen ciertos deberes a la demandada, donde sus vías yacen sobre esa carretera.

Si la vía entre las paradas 19 y 20 fué o no en realidad puesta sobre una parte no transitada de una vía pública, no es un punto trascendental.

Si la vía fué colocada en esa forma, el caso cae *a fortiori* dentro de la regla establecida en el caso de *State* v. *United Rwys. Co., supra:*

''El hecho de que la naturaleza de la construcción necesaria para la explotación de su sistema ferroviario por la compañía en secciones rurales y urbanas haga impracticable usar para el tráfico general aquella parte del camino ocupada por sus vías, no la releva de su obligación de usar el debido cuidado en la explotación de tal sistema para evitar daños a personas que legalmente usen aquella parte de la carretera que se dedica al tráfico en general.''

Si la vía no fué colocada en esa forma, los cruces privados a que nos hemos referido en nuestra opinión anterior (uno de los cuales estaba bastante cerca del lugar en que ocurrió el accidente), la Escuela de Beneficencia para Niños en la Parada 19, la mucha proximidad de la porción transitada de la carretera a un lado y la naturaleza peligrosa de la vereda usada como acera al otro lado, eran más que suficientes para imponer a la demandada el deber de estar a la expectativa.

■ El accidente no ocurrió en un lugar poco frecuentado, en campo libre, donde no hubiera motivo para anticipar la presencia de transgresores sobre la servidumbre de paso de la demandada. El tranvía de la demandada, que estaba pró-

ximo a entrar al desvío de la parada 19, corría a una velocidad mínima obedeciendo a la amonestación que fijó la demandada a la entrada. No estaba esperando en el desvío carro alguno que viniera en dirección contraria. El detener el carro de la demandada por un momento, o el dar aviso y reducir la velocidad lo necesario para que la demandante pudiera llegar a un sitio en que estuviese a salvo, no habría demorado el servicio de tranvías de la demandada en ninguna forma apreciable.

La demandante era, o una viandante sobre la vía pública, o una persona con facultad de estar en la servidumbre de la demandada. No era una transgresora. Durante muchos años la demandada había corrido sus tranvías frente a la casa de los Barletta y tenía pleno conocimiento de la forma en que era usada por el público la estrecha vereda entre la vía y la verja. Era el deber de la demandada prever la presencia de viandantes en los rieles, estar a la expectativa de ellos y usar de ordinario cuidado para evitar lesionarlos. *Vidal* v. *P. R. Ry., Light & P. Co.,* 32 D.P.R. 769; *Teakle* v. *San Pedro L. A. & S. L. R. Co.* (Utah), 90 Pac. 402; *Chesapeake & O. Ry. Co.* v. *Corbin's Adm'r.* (Va.), 67 S. E. 180; *Dent* v. *Bellows Falls & S. R. St. Ry. Co.,* 116 Atl. 83.

Cuando la demandante cruzó el portón y dobló hacia la estrecha vereda que estaba entre la vía y la verja de los Barletta, su negligencia culminó en una situación en que carecía de medios adecuados para escapar. Si inmediatamente después ella hubiese advertido la mucha proximidad del carro que se acercaba, quizá ella hubiese vuelto hacia atrás y llegado al portón antes de que el carro pasara por aquel sitio. Después de dar los primeros pasos por la vereda, esa vía de escapatoria quedaba eliminada. La posición de la demandante entonces llegó a ser una de peligro claro e inminente. Se trataba de un verdadero peligro, del cual no era improbable que resultara daño. La probabilidad de tal daño, si la demandada no hizo los esfuerzos adecuados para evitarlo,

en seguida hubiese sido aparente a cualquier persona de ordinaria prudencia. 45 C. J. 992, sec. 543. La posibilidad de que si la demandante hubiese estado provista de suficiente presencia de ánimo, habría podido evitar el accidente colocándose pegada a la verja y permitiendo que el carro pasara, no era suficiente para privar su situación del carácter peligroso que tenía. Debe considerarse que su negligencia culminó y cesó cuando aún había tiempo para que la demandada, en el ejercicio de ordinaria prudencia, evitara la desgracia. Así despojada de su naturaleza concurrente y contribuyente, la negligencia de la demandante se convirtió en una causa remota en vez de una causa próxima, y la corte de distrito no cometió error al concluir que la demandada tuvo la última oportunidad para evitar el daño, y que su negligencia continuada, posterior y superveniente, más bien que la de la demandante, fué la causa próxima del percance.

En 45 C. J. 994, sección 545, hallamos lo siguiente:

"Los tribunales no están en perfecto acuerdo respecto a si puede haber resarcimiento por una persona que pudo, mediante el ejercicio de ordinario cuidado, librarse a sí misma, o su propiedad, del peligro, si hubiese tenido conocimiento de él, pero que dejó de hacerlo por estar inconsciente del riesgo. Si bien hay autoridades en sentido contrario, se ha resuelto generalmente que puede haber resarcimiento en tales casos. En una jurisdicción, sin embargo, se ha resuelto que, si bien se puede conceder indemnización en tales casos cuando el demandante permanece pasivo y nada hace materialmente para variar su situación expuesta mediante conducta activa que no constituya cuidado ordinario, no puede recobrar si él, después de exponerse al peligro, en vez de hacer que esa situación fija permanezca sin variar, continúa como un agente activo que produce las condiciones bajo las cuales se recibe el daño, hasta que llega a serle demasiado tarde al demandado para evitar el accidente."

En una nota que aparece al pie, hay una cita de la opinión en *Nehring* v. *Connecticut Co.* 84 Atl. 301, como explicativa del fundamento de la regla en la jurisdicción a que se refiere el párrafo que antecede.

En *Vidal* v. *P. R. Ry., Light & P. Co., supra*, reconocimos

una distinción posible entre la negligencia activa y la pasiva cuando dijimos que: ". . . a pesar del deber del demandado de evitar el daño, una persona no puede recobrar si su misma negligencia continúa activamente hasta el momento del accidente."

El caso de autos cae dentro del tercero, así como dentro del segundo, de los varios grupos de casos según la clasificación hecha en el caso de Nehring.

Véanse, además: *Salt Lake & U. R. Co.* v. *Trumbull,* 246 Fed. 806; *Bremmerman* v. *Georgetown & T. Ry. Co.,* 273 Fed. 342; *Standard Oil Co.* v. *McDaniel,* 280 Fed. 993; *Chesapeake & O. Ry. Co.* v. *Corbin's Adm'r, supra; Locke* v. *Puget Sound International Ry. & Power Co.,* 171 Pac. 242; *State* v. *United Rwys. Co., supra; Rawitzer* v. *St. Paul City Ry. Co.,* 100 N. W. 664; *Colorado Springs & I. Ry. Co.* v. *Merrill,* 149 Pac. 843; *Cavanaugh* v. *Boston & M. R. R.* (N. H.), 79 Atl. 694; *Darling* v. *Pac. Electric Ry. Co., supra;* la opinión disidente del Juez Presidente Sr. Beatty, con la cual estuvo conforme el Juez Asociado Sr. Van Dyke, en *Green* v. *Los Angeles, etc. Ry. Co.,* 143 Cal. 48; *Berguin* v. *Pacific Electric Ry. Co.,* 203 Cal. 116, y *Mihelish* v. *Butte Electric Co.,* 281 Pac. 540.

■ La inconsciencia de la demandante en torno al peligro que la acechaba no ha sido discutida por la apelante. Si habremos de ir o no tan lejos como algunos de esos casos, o si adoptaremos o no la distinción hecha en Connecticut entre la negligencia activa y la pasiva, son cuestiones que pueden dejarse para lo futuro. Sin embargo, subsiste el hecho de que después de dar los primeros pasos por la vereda, la demandante nada hizo para aumentar el peligro o para cambiar la situación mediante una conducta activa y negligente. Luego de eso, cada paso que ella daba la conducía a un sitio de seguridad allende el extremo de la verja de los Barletta. Si el motorista hubiera estado mirando hacia adelante, necesariamente él habría venido en conocimiento de que la ac-

tora estaba inconsciente del peligro y que no se echaría a un lado aunque hubiera podido. Hasta el momento del choque, él pudo haber detenido su carro a tiempo para evitar que las ruedas mutilaran la pierna de la demandante. De suerte que si hemos de seguir la tendencia general de decisiones recientes, debemos estimar que la negligencia de la demandante cesó, y que la del motorista fué la causa próxima, eficiente, del suceso, aunque no hubiese habido verja alguna que impidiera a la demandante salir de la senda del tranvía.

La teoría que sobre el caso propugna la apelante es que cuando la demandante llegó al portón, el carro eléctrico ya estaba discurriendo por ese sitio, y que la demandante fué chocada y arrojada al suelo por el lado del tranvía, bien en el portón, o cerca de él, mientras caminaba al lado del carro entre el mismo y la verja. Esta cuestión de hecho fué en dos ocasiones resuelta en forma adversa a la demandada por dos jueces distintos, y no hallamos un error tan manifiesto en ese sentido que justifique la revocación. Durante el primer juicio, la demandante presentó cuatro fotografías como prueba. Sólo se mencionan dos veces en el alegato de la apelante. Primeramente la apelante se refiere a ellas como evidencia en apoyo de la contención de que la corte inferior erró al declarar que el sitio en que ocurrió el accidente era una vía pública. Después la apelante se basa en el *exhibit* "D" para demostrar que la vía era recta entre la casa de los Barletta y la parada 20, y que al trasponer la demandante el portón pudo haber visto un carro que viniera de la parada 20. A nuestro juicio, estas fotografías tienden a sostener las conclusiones de hecho del juez de distrito y las a que hemos llegado.

Lo que hemos dicho dispone del caso, a menos que se pueda demostrar que la doctrina de última oportunidad expedita no es aplicable a los hechos. Esto nos lleva a la contención de la apelante de que la corte de distrito erró al declarar que la negligencia de la demandante no la impedía re-

cobrar, porque la conducta del empleado de la demandada fué la causa próxima del accidente, y al resolver que la demandada tuvo la última oportunidad para prevenirlo.

Más específicamente, los puntos propugnados son que debe demostrarse el conocimiento efectivo de la demandada del peligro a que estaba expuesta la demandante; que la negligencia contribuyente de la demandante fué continua, activa y concurrente; que aun si la demandada se hubiera percatado del peligro de la demandante no podría haber resarcimiento, y que la demanda no aducía hechos suficientes para justificar la aplicación de la doctrina de *last clear chance*.

En apoyo de la contención de que esa doctrina debe limitarse a casos en que el peligro en que se hallaba la parte demandante fué realmente descubierto a tiempo para evitar el accidente, la apelante cita de:

Davies v. Mann, 10 M. & W. 546;

Un artículo en 3 Harvard Law Review, 263;

20 R.C.L. 141, 142 y 143;

Wheelock v. Clay, 13 Fed. (2d) 972;

Walker v. East St. Louis & S. Ry. Co., 25 Fed. (2) 579;

Bourrett v. Chicago & N. W. Ry. Co., 132 N. W. 973, 36 L. R. A. (N.S.) 957;

Keefe v. Chicago & N. W.. Ry. Co., 54 Am. St. Rep. 542, 60 N. W. 504;

Northern Pac. Ry. Co. v. Jones, 144 Fed. 47; y 20 R. C. L. 143.

En *Northern Pacific Ry. Co.* v. *Jones,* la Corte de Circuito de Apelaciones para el Noveno Circuito admite que "No hubo prueba en el caso de Ives al efecto de que el causante del actor fué visto por los que estaban manejando el tren a tiempo para prevenir el accidente."

Antes de Jones ser atrapado por el tren, que corría de seis a ocho millas por hora, él había "caminado por los railes del ferrocarril una distancia de más de media milla sin mirar hacia atrás una vez siquiera, ni detenerse a escuchar si un tren se aproximaba." El tribunal dijo: (bastardillas nuestras)

"La doctrina de última oportunidad . . . . se originó en el caso de Davies v. Mann, en que se resolvió que la falta de cuidado ordinario en el demandante no constituyó negligencia concurrente, porque fué una causa remota o mera condición del daño, y no contribuyó inmediatamente a él, y porque la negligencia del demandado surgió con posterioridad a la del demandante, y la de éste no era tan obvia que *pudiera haber sido advertida* mediante el ejercicio de ordinario cuidado. Esa doctrina no es de aplicación a un caso en que el demandante voluntariamente se coloca en un sitio de peligro *del cual tiene en el momento medios de escaparse,* y continúa allí sin ejercer las precauciones que un hombre ordinariamente prudente tomaría. Nada tenemos que ver aquí con la ley aplicable a un caso en que el lesionado se encuentra en un sitio de peligro, como por ejemplo, un viaducto ferroviario, del cual le es imposible salir cuando se aproxima un tren, y cuando su situación es advertida, *o debió haber sido advertida,* por los encargados del tren."

Los casos de Wheelock y Walker proceden de una línea de decisiones de la Corte de Circuito de Apelaciones para el Octavo Circuito. Toda la serie descansa en un *dictum* en *Denver City Tramway Co.* v. *Cobb,* 164 Fed. 41. No hay razonamiento alguno en cualquiera de esas decisiones (a menos que sea después del caso de Walker) en apoyo del *dictum.*

En el caso de *Cobb* la corte adujo como una de las razones por las cuales la doctrina de última oportunidad era inaplicable:

"Segunda: La excepción no cabe cuando la negligencia o situación peligrosa del demandante no son advertidas por la demandada a tiempo para evitar el accidente."

En apoyo de esta aseveración el tribunal citó:

Chunn v. City & Suburban Ry. Co., *supra;*
Illinois Central R. Co. v. Ackerman, 144 Fed. 959;
Fonda v. St. Paul City Ry. Co., 71 Minn. 438, 451; 74 N. W. 166;
Alger, Smith & Co. v. Duluth, etc. Co., 93 Minn. 314, 101 N. W. 298;
Bennichsen v. Market St. Ry. Co., 149 Cal. 18, 84 Pac. 420;
Cullen v. Baltimore & Potomac R. R. Co., 8 App. D. C. 69;
Rider v. Syracuse Rapid Transit Co., 171 N. Y. 139, 63 N. E. 836, 58 L.R.A. 125;

Chicago, R. I. & R. Ry. Co. v. Crisman, 19 Colo. 30, 34 Pac. 286;
Denver & R. G. R. Co. v. Spencer, 25 Colo 9, 52 Pac. 211;
Cooley on Torts, vol. 2 (3ª. ed.) 1442-1445; y 3 Elliott on Railroads (2ª. ed.) sec. 1175.

Nuestra biblioteca no contiene un ejemplar de "Elliott on Railroads."

Lo que el Juez Cooley dice en el párrafo aludido, bajo el epígrafe de "Negligencia e imprudencia coadyutorias," dista mucho de establecer la conclusión de que la doctrina de última oportunidad no es de aplicación cuando el demandado no se percata de la posición arriesgada del demandante en tiempo suficiente para prevenir el daño.

El caso de Ackerman no enuncia la regla ni expresa motivo alguna para su existencia.

En el caso de *Crisman,* la Corte Suprema de Colorado, después de exponer la regla general sobre negligencia contribuyente, se conforma con decir que "esta regla es aplicable sólo a casos en que la compañía ferroviaria tiene conocimiento de la situación peligrosa de la persona lesionada, a tiempo para evitar el accidente, mediante el ejercicio de ordinaria prudencia, y es culpable de aquella conducta que implique la intención o el deseo de causar el daño. *Railway Co.* v. *Hunter,* 33 Ind. 335; *Railway Co.* v. *Cranmer,* 4 Colo. 542." Nuestra colección de las decisiones de Colorado empieza con el tomo 16. El caso de Indiana habla por sí mismo. Los de *Spencer* y *Denver & B. P. R. T. Co.* v. *Dwyer,* 20 Colo. 132, arrojan muy poca luz adicional sobre la materia.

Nada hallamos, bien en el razonamiento de la opinión de la mayoría en el caso de Rider, o en las autoridades allí invocadas, en apoyo del *dictum* en el caso de Cobb. En verdad, la fraseología usada en la discusión de los casos de *McKeon* v. *Railway Co.* (20 App. Div. 601, 47 N. Y. Sup. 374) no hace una distinción entre el peligro descubierto y el conocimiento implícito del mismo. La declaración final respecto al caso de Wasmer es que la actuación del maquinista al arro-

llar al causante de la parte demandante "cuando éste pudo
haber sido visto a tiempo para detener el tren, fué la causa
próxima del accidente."

El primero de los dos casos de Minnesota viene algo más
al grano. En él, la corte dijo:

"Los letrados del demandante sostienen que no era necesario, para
que las instrucciones fueran aplicables, que el motorista viese, en
efecto, al demandante en un lugar de peligro a tiempo para preve-
nir el accidente; que bastaba que, ejerciendo la debida circunspec-
ción, el motorista debiera haberlo visto. Semejante regla en casos
en que la negligencia concurrente es la causa próxima del daño, prác-
ticamente eliminaría por completo la doctrina de negligencia contri-
buyente."

Esta aseveración nos deja en libertad de asumir que, si
la regla invocada por los abogados en el caso de Minnesota
se limitara a casos en que la negligencia del demandante no
es concurrente con la del demandado ni la causa próxima del
daño, podría sobrevivir la doctrina de negligencia contribu-
yente.

En el caso de *Bennichsen,* el fundamento señalado por la
Corte de California para negarse a adoptar la teoría de co-
nocimiento implícito, es que "ningún caso ha ido tan lejos;
e ir tan lejos equivaldría prácticamente a destruir la doctrina
de negligencia contribuyente."

En *Cullen* v. *The Baltimore & Potomac Railroad Co.,* la
Corte de Apelaciones del Distrito de Columbia es más explí-
cita, pero la posición allí asumida ha sido abandonada desde
entonces, por lo menos en lo que se refiere a tranvías. *Wash-
ington R. & E. Co.* v. *Cullember,* 39 App. D. C. 316; *Wash-
ington Ry. & Electric Co.* v. *Stuart,* 50 App. D. C. 74; y
*Washington Ry. & Electric Co.* v. *Buscher,* 54 App. D. C. 353.
Sin embargo, el razonamiento en el caso de Cullen no es más
aplicable a casos de ferrocarriles que a los de tranvías. En
tal virtud, la Corte de Apelaciones, al abandonar su posición
original, necesariamente ha repudiado el razonamiento en que
se basó tal posición.

Según demuestra el caso de *Cullember,* el de *Chunn* v. *City & Suburban Ry. Co.,* la más destacada de las autoridades citadas en el caso de Cobb, no sostiene el *dictum* de la Corte de Circuito de Apelaciones, sino que tiende más bien a una conclusión contraria.

De existir algún fundamento sólido para el *dictum* en el caso de Cobb, no ha de hallarse en los casos allí citados.

■ Volviendo al alegato de la apelante, el artículo en 3 *Harvard Law Review* es autoridad (aunque no es menester autoridad alguna) para la declaración de que la regla general de negligencia contribuyente "se basa principal, si no totalmente, en consideraciones de orden público."

Los tribunales de esta isla no están tan firmemente obligados por la doctrina de negligencia contribuyente como las cortes en jurisdicciones en que priva el derecho común. El artículo 1803 de nuestro Código Civil dispone que "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." El artículo 1804 hace al dueño o director de un establecimiento o empresa "igualmente (responsable) respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en los que tuvieran empleados, o con ocasión de sus funciones." La disposición final es que "la responsabilidad de que trata este artículo cesará cuando las personas en él mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño." No se hace mención de negligencia contribuyente.

Véase también el caso de *Bakes* v. *The Atlantic Gulf & Pacific Co.,* 7 Jur. Fil. 370.

La doctrina de negligencia contribuyente ha sido adoptada en esta jurisdicción conjuntamente con las limitaciones impuestas por la regla sentada en *Davies* v. *Mann,* y sujeta a las mismas. Si esa regla ha de aplicarse sólo a casos en que en efecto se ha descubierto el peligro, o debe extenderse a aquéllos en que mediante el ejercicio de ordinaria prudencia

el peligro en que se hallaba el demandante pudo haberse advertido, es cuestión de conveniencia. Fué tocada en el caso de Vidal, pero se reservó expresamente para futura consideración.

Una respuesta suficiente al razonamiento de la Corte Suprema de Iowa en el caso de *Keefe* y al de la mayoría en el de *Bourrett,* puede hallarse en la opinión disidente emitida por el Juez Ladd en el último caso mencionado y en una nota que sobre el mismo aparece en 36 L.R.A. (N. S.) 957.

Según se indicó en la nota:

". . . De la declaración de que 'la doctrina de *last clear . chance* se base en el conocimiento real de la negligencia del demandante', hecha en la opinión de la mayoría en Bourrett v. Chicago & N. W. R. Co., no se colige claramente que pretenda negar que el incumplimiento del deber de advertir el peligro sostiene la doctrina cuando la negligencia del demandado al dejar de percatarse del peligro debe considerarse que ha continuado después de la culminación o cesación de la negligencia del demandante, o que vaya más allá de afirmar que el descubrimiento del peligro sea esencial para la aplicación de la doctrina cuando la negligencia de ambas partes fué concurrente en todo momento. En realidad, podrá observarse que la mayoría fué de opinión que la negligencia de ambas partes culminó en el momento del choque, y que el demandado, a partir de ese momento estaba tan impotente para advertir el peligro del demandante como el demandante para salir de su situación peligrosa . . . . De todos modos, en vista de la conclusión de la mayoría de que las circunstancias rechazaban la continuación de la negligencia del demandado después de la cesación de la negligencia del demandante, no había motivo para que la corte fuera más allá de declarar que cuanto la negligencia de ambas partes es concurrente, el conocimiento real del peligro es esencial para que la doctrina sea aplicable. Si la declaración se excede de ese principio, desde entonces es un *obiter.*"

Según indica el Juez Ladd, "No se demostró conocimiento real del riesgo que corría el histórico asno en la carretera, en el célebre caso de *Davies* v. *Mann.* . ., donde se supone que se originó la regla; siendo el dejar de advertirlo y de evitar el daño el verdadero fundamento de la negligencia."

Si el texto en 20 R.C.L. 143 significa que las decisiones que mantienen la doctrina de conocimiento implícito "virtualmente suprimen la doctrina de negligencia contribuyente," la aseveración no puede ser substanciada. De poder serlo, entonces surgiría la cuestión de si el resultado no podría considerarse justamente como la supervivencia del más fuerte.

Ruling Case Law cita *Smith* v. *Norfolk, etc. R. Co.,* 114 N. C. 728, 19 S. E. 863, 25 L.R.A. 287; *Drown* v. *Northern Ohio Traction Co.,* 76 Ohio St. 234, 81 N. E. 326, y una nota en Ann. Cas. 1912–B, 889. En cada uno de esos dos casos, la negligencia del demandado y la negligencia contribuyente en cuestión son tratadas como concurrentes. Por tanto, no sostienen el texto. En el caso de Carolina del Norte, el tribunal dijo:

"Los letrados insisten en que, hasta que en efecto se vea a la persona que aparentemente está en peligro, la negligencia de tal persona no puede decirse en un sentido legal que preceda la del demandado; y por tanto, a menos que hubiese podido evitarse el accidente mediante el ejercicio de prudencia ordinaria después de haberse visto a tal persona, el demandante no tiene causa de acción. Debe ser evidente que, si tal es el criterio correcto, la regla aludida tendría poco margen para ser aplicada; pues cuando un maquinista ve que una persona es aparentemente insensible al peligro, y deja de ejercer la ordinaria prudencia para evitar arrollarla, él es culpable de tal protervo desprecio hacia la vida de sus semejantes que su conducta en ese sentido es considerada voluntaria a un extremo tal que lo coloca enteramente fuera de la ley de negligencia. Beach, Contrib. Neg., 55. . . ."

Después de alguna discusión sobre las autoridades citadas por los abogados, la corte continúa diciendo:

". . . Un tratadista perspicaz observa: 'Pero estos casos pueden fundarse en el principio de que no se deja de ejercer el debido cuidado al no esperar que haya personas en un sitio donde no tienen derecho a estar.' . . . La 'cláusula sobre descubrimiento' del Juez Thompson . . . . parece basarse en parte en esta misma idea. 2

Thomp. Neg., 1157, sec. 7. El Juez Thompson . . . . admite que este criterio no está sostenido por el peso de las autoridades, . . . . y procede a establecer la regla que elimina el factor del descubrimiento y que ha sido literalmente adoptada por este tribunal en el caso de Farmers, *supra*, y en muchos otros. Que el descubrimiento del peligro no es necesario para que la negligencia del demandante sea la causa próxima del daño, es evidente del caso de Butterfield v. Forrester, 11 East 60, que es la decisión más antigua sobre la cuestion de negligencia contribuyente . . . . Así, por otra parte, del caso de Davies v. Mann no se desprende que el demandado descubriera el histórico asno atado en la carretera, y parece que el dejar de verlo y evadirlo fué la verdadera base de la acción. Debe también hacerse constar que en el primer caso en que esta corte aplicó el principio de Davies v. Mann no aparecía que el demandado viera al demandante en el sitio de peligro; y allí se resolvió que, aunque el demandante fué negligente, su negligencia precedió la del demandado, quien, ejerciendo ordinaria prudencia, pudo haber prevenido el daño. Gunter v. Wicker, *supra* . . . .

"Aplicando la regla que hemos expresado a accidentes ocurridos en las vías ferroviarias, puede ser ilustrada en la siguiente forma: Primero, debe haberse impuesto un deber al maquinista, pues de lo contrario no hay negligencia a la cual haya de contribuir la de la parte lesionada. El deber que estamos considerando es permanecer alerta (consistente con otros deberes al manipular el tren) a fin de descubrir, y evitar, daño a personas que puedan hallarse en la vía, y que aparentemente estén corriendo un peligro inconsciente o por ellas inevitable . . . . Decir que el principio de Davies v. Mann no es aplicable hasta que se advierte el peligro equivale prácticamente a abrogar el deber."

En la nota (Ann. Cas. 1912–B 889), la aproximación más cercana a la fraseología del texto en *Ruling Case Law, supra,* se halla en la siguiente cita de *Watson* v. *Mound City St. R. Co.* (Mo.), 34 S. W. 573:

"Llevar esta doctrina (la de última oportunidad expedita) al extremo de decir que no sería culpable de negligencia concurrente la persona que a sabiendas cruza los rieles de un ferrocarril tan cerca de un tren en movimiento que es arrollada por el mismo antes de terminar de cruzar, virtualmente aboliría por completo la ley de negligencia contribuyente."

En *Nehring* v. *Connecticut Co., supra,* la Corte Suprema de Connecticut llega a la siguiente conclusión:

"... Muy bien podría dudarse que la doctrina merezca una clasificación y un nombre, cual si fuese un principio independiente. Pero si .... se ha de dignificar en esa forma, es aparente que no existe inconsistencia alguna entre ella y la regla de negligencia contribuyente, y que el dominio de la última regla en forma alguna es invadido o reducido al dársele entero reconocimiento ..."

En *Drown* v. *Northern Ohio Traction Co., supra,*—reportado también en 10 L.R.A. (N. S.) 421—la Corte Suprema de Ohio dice:

".... Ahora, debe ser aparente .... que ella sólo puede aplicarse a casos en que la negligencia del demandado es próxima y la del demandante remota; pues si tanto el demandante como el demandado han sido negligentes y directamente han contribuído al accidente, entonces el caso es, pura y simplemente, uno de negligencia contribuyente. Pero si la negligencia del demandante meramente lo coloca en un lugar de peligro, y se detiene allí continuando inactivo hasta el momento del accidente, y el demandado sabe del peligro en que se halla, o, mediante el ejercicio de la diligencia que la ley le impone, puede advertirlo, entonces, si la negligencia del demandante no concurre combinadamente con la del demandado para producir el daño, la negligencia del demandado es la causa próxima del accidente y la del demandante es una causa remota. Este es todo el quid de la llamada doctrina de 'última oportunidad expedita.'"

En una nota sobre el caso de *Bourrett* v. *Chicago & N. W. R. Co.,* en la página 961, se expresa que cuando se recuerdan ciertas cosas allí enumeradas, "el temor de que extender la doctrina a la omisión del deber de descubrir el peligro, indebidamente extenderá la responsabilidad de los demandados, y en efecto abrogará la doctrina de negligencia contribuyente, tiene muy poca base substancial, excepto, tal vez, en jurisdicciones en que las cortes son demasiado liberales en sus criterios respecto a las circunstancias que interrumpen la negligencia del demandante." Esto no es más que una repetición de manifestaciones similares que se encuentran en las notas anteriores de la misma serie. Así,

pues, ni aun los tribunales que se rigen por el derecho común necesitan mirar con alarma la posible extinción de la doctrina de negligencia contribuyente, si ellos pueden convenir con el anotador respecto a cuándo y cómo debe aplicarse la doctrina de última oportunidad expedita, y si ellos mismos no son "demasiado liberales" al determinar qué interrumpe la negligencia de un demandante.

Sobre este particular, es bueno agregar que la Corte de Circuito de Apelaciones para el Octavo Circuito ha sido sumamente liberal al tratar de esta cuestión de interrupción. Véase *Salt Lake & U. R. Co.* v. *Trumbull, supra,* en que se discute y distingue el caso de Cobb.

La regla de conocimiento implícito es fundamentalmente justa y razonable. Es edificante y saludable desde el punto de vista del orden público, y está sostenida por el peso decidido de las autoridades. *Consolidated Railroad Company* v. *Armstrong,* 92 Md. 554, 48 Atl. 1047; *Payne* v. *Healey,* 139 Md. 86; *State* v. *United Rwys. Co., supra; State* v. *Washington B. & A. R. Co.,* 149 Md. 443; *Miller* v. *Central Vermont Ry. Co.,* 113 Atl. 524; *Dent* v. *Bellows Falls & S. R. St. Ry. Co., supra; Fine* v. *Connecticut Co.,* 103 Atl. 901; *Dyer* v. *Cumberland County Power & Light Co.,* 115 Atl. 194.

De la opinión en el caso de Armstrong tomamos el siguiente extracto:

"La diferencia entre la modificación del principio general reconocido como propio en el caso de Newbeur's y el sancionado por esta corte en casos recientes es simplemente que en el caso anterior se declaró responsable al demandado si éste, ejerciendo ordinaria prudencia, después de haberse dado cuenta del peligro del demandante, hubiese podido evitar el accidente, y en los casos posteriores se le hizo responsable si hubiera podido prevenir el daño después que tuvo, o debió haber tenido, conocimiento del peligro. No existe diferencia en principio entre estas dos formas de instruir al jurado, toda vez que no puede alegarse seriamente que cuando un demandado está en una posición en que debe ver, o ejerciendo el cuidado de rigor, puede ver, el peligro en que se halla el demandante, y cambia la cara o

cierra los ojos y no lo ve, puede evadir la responsabilidad por los daños y perjuicios provenientes de su conducta.''

En el caso de Dyer la Corte Suprema de Maine declaró:

''Cuando el demandado no tiene deber alguno para con el demandante, como cuando se trata de transgresores, pueden existir buenas razones para adherirse a la regla de conocimiento efectivo.' Shearman and Redfield on Neg. (5ª. ed.), sec. 484.

''Sin embargo, cuando se trata de ferrocarriles que usan las calles, creemos que el orden público exige que ellos sean responsables de los daños irrogados a aquellas personas que usen legalmente la vía pública y son lesionadas por dejar los empleados de la compañía ferroviaria de ejercer razonable prudencia y estar pendientes de los caminantes, desde luego, siempre que éstos no sean activamente negligentes al ocurrir el suceso y que su negligencia contribuya a su propio daño, y que los empleados del demandado, mediante el ejercicio del debido cuidado, hayan podido descubrir el peligro del demandante a tiempo para evitar el daño. De lo contrario, los motoristas de tranvías podrían incurrir en la negligencia más crasa al desatender sus deberes—hablando con los pasajeros en los carros o mirando a los que ocupan las aceras—y a menos que se demuestre que efectivamente vieron al demandante la compañía estaría exenta de responsabilidad. Tal doctrina ha sido caracterizada, y no demasiado severamente, por el Sr. Thompson en su obra sobre Negligencia, tomo 2, sec. 476, como 'una miserable doctrina en favor de la cual no puede decirse una sola palabra'.''

El autor de la nota en torno al caso de *Bogan* v. *Carolina Central R. Co.*, 55 L.R.A. 418, nos dice en la página 421 que:

'' . . . Si la corte resuelve que la doctrina es aplicable a los casos en que el demandado descubre el riesgo del demandante, no parece haber razón lógica alguna para no aplicarla cuando el demandado en realidad no descubrió tal peligro, si era su deber advertirlo.''

En la nota en 36 L.R.A. (N. S.), página 958, se dice:

''Cuando la negligencia del demandado, al dejar de descubrir el peligro, continuó como causa eficiente del daño después que pueda considerarse que cesó la negligencia anterior del demandante, la tendencia decidida, si bien hay conflicto sobre la materia, es hacia el criterio de que el dejar el demandado de advertir el peligro es suficiente para sostener la doctrina y que no es necesario descubrir efectiva-

mente el peligro si bajo las circunstancias al demandado incumbía advertirlo y el cumplimiento de su deber le habría permitido evitar el accidente.''

En *State* v. *United Rwys. Co., supra,* la corte cita de 3 Elliott on Railroads, pár. 1542, lo que sigue:

''En la mayoría de las jurisdicciones, de conformidad con la doctrina de última oportunidad y última oportunidad para prevenir el daño, el demandante puede tener derecho a indemnización no obstante haberse colocado negligentemente en un sitio peligroso donde tenía derecho a estar sin ser un transgresor, si el demandado descubrió (o en el ejercicio de la ordinaria prudencia y circunspección de rigor debió haber descubierto) el peligro del demandante a tiempo para eludir el accidente, y dejó de actuar con la circunspección necesaria para prevenirlo.''

En *Locke* v. *Puget Sound International Ry., supra,* la Corte Suprema de Wáshington cita con aprobación un párrafo similar de Nellis on Street Railways (2a. ed.) 462. Véanse, además, *Turnbull* v. *New Orleans & C. R. Co.,* 120 Fed. 783, y *Philadelphia & R. R. Co.* v. *Klutt,* 148 Fed. 818 (certiorari denegado, 204 U. S. 672). En *Kansas City Southern Railway Co.* v. *Ellzey,* 275 U. S. 236, la Corte Suprema, refiriéndose a la doctrina de última oportunidad expedita, por voz de su Juez Asociado Sr. Stone dijo (bastardillas nuestras):

''Esa doctrina, *rectamente aplicada en el caso de Chunn,* no equivale a otra cosa que a lo siguiente: Que un demandado negligente será responsable a un demandante negligente si el demandado, conociendo el peligro del demandante, *o desconociéndolo sólo por su descuido,* tuvo en efecto una oportunidad posterior al demandante para evitar el daño. Grand Trunk Ry. v. Ives, 144 U.S. 408; Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 558.''

No podemos convenir con la apelante en que la doctrina aludida debe limitarse a casos en que el peligro del demandante fué advertido a tiempo para prevenir el daño.

Otra contención es que la corte de distrito erró al sostener que el sitio en que acaeció el accidente era un camino pú-

blico. El alegato de la apelante no cita página alguna del récord, y no hallamos que el juez de distrito así lo resolviera.

La apelante también dice que la corte inferior cometió error al no declarar que la demandante fué culpable de negligencia contribuyente y que tal negligencia fué la causa directa y próxima de la desgracia, y también al no resolver que la demandante no tenía derecho a indemnización por concepto de tal negligencia. La contención, tal como se discute en el alegato, es, substancialmente, que en ausencia de cualquier prueba adicional relativa a la cuestión de negligencia contribuyente, nuestra opinión en el primer recurso es concluyente sobre este extremo. Si se interpreta técnica y literalmente el lenguaje usado en esa opinión, la posición de la apelante es bastante plausible. Sin embargo, las expresiones en que ella se basa no deben ser interpretadas en esa forma. No importa lo que hayamos asumido, correcta o incorrectamente, consciente o inconscientemente, en ella no estábamos considerando la cuestión en torno a lo que constituye la verdadera base de la doctrina de última oportunidad expedita. No tuvimos en mente en absoluto la distinción entre la teoría de última oportunidad como doctrina independiente o como excepción a la doctrina general de negligencia contribuyente, y la teoría según la cual la doctrina de última oportunidad ha sido confundida, casi al extremo de esfumarse, en la de causa próxima. Véase 45 C. J. 988, sec. 540, y la nota en 55 L.R.A., *supra*.

No obstante lo que pueda decirse de nuestra opinión anterior, no fué nuestro propósito impedir ulterior consideración de la cuestión de negligencia contribuyente en relación con la doctrina de última oportunidad para prevenir el daño. Así, pues, el juez de distrito muy propiamente rehusó adoptar la interpretación que la demandada pretendía se le diera a esa opinión.

La apelante cita 25 R.C.L. 1255, sec. 116, y nos remite a los siguientes casos como aplicables *a fortiori* a los hechos en

el caso de autos: *State* v. *Cumberland Electric R. Co.,* 106
Md. 529, 68 Atl. 197, 16 L.R.A. (N. S.) 297; *Yellick* v. *North-
ern Ry Co.,* 170 N. W. 941; *Kelley* v. *Boston Electric Co.,*
15 L.R.A. (N. S.) 282.

En el caso *State to Use of Carey* v. *Cumberland Electric
R. Co., supra,* Carey "fué golpeado por el furgón en el mo-
mento de tirarse de espalda del eje de la rueda del camión
hacia, si no contra, una vía férrea que sólo estaba a dos pies
de distancia de la rueda, sin tomar la más mínima precau-
ción para cerciorarse de si se aproximaba el tren." Sólo
cerca de seis pulgadas del espacio entre la vía y la rueda del
camión eran ocupadas por la parte del furgón que sobresalía
de los rieles. La corte dijo:

"Los abogados de los apelantes sostuvieron con gran habilidad
durante la vista de la apelación que el caso caía dentro del campo de
la doctrina de última oportunidad expedita sobre la teoría de que la
posición de Carey mientras estaba parado en el eje era una de pe-
ligro en la que el motorista del tren que se aproximaba pudo, ejer-
ciendo propia diligencia, haberlo visto a tiempo para salvarlo de sus
consecuencias, dando oportuno aviso o señal, o deteniendo el tren.
Si su posición en el eje era peligrosa—sobre lo cual no expresamos
opinión alguna—no fué el peligro de esa posición, en verdad no fué
ese peligro por sí solo, lo que le hizo perder la vida. El no fué gol-
peado mientras estaba parado en el eje sino mientras se dedicaba vo-
luntaria y deliberadamente al negligentísimo acto de descender de
espalda del eje hacia la vía sin siquiera mirar a ver si el tren se apro-
ximaba. No hubo evidencia en el récord que tendiera a probar que
el motorista vió, o pudo haber visto, cuando Carey trató de bajar del
eje del camión hacia la vía, a tiempo de detener el tren antes de arro-
llarlo, o de darle un aviso más oportuno que el del pito, que fué to-
cado. Bajo estas circunstancias, con prueba clara de este acto pre-
ciso de negligencia de su parte que contribuyó de una manera directa
al accidente, hubiera sido impropio que el ilustrado juez de la corte
inferior sometiera el caso al jurado para permitirle dedicarse a con-
jeturas respecto a si Carey hubiera estado en peligro de haber per-
manecido en el eje o a si no pudo permanecer seguro en el espacio
intermedio entre el camión y la vía, mientras pasaba el tren."

Si Carey hubiese permanecido parado sobre el eje del ca-

mión y hubiera sido lesionado mientras se hallaba en esa posición por un carro al pasar, se habría presentado un caso distinto. Su acto al saltar hacia atrás del eje a la tierra frente a un tranvía interurbano que corría a gran velocidad, sin mirar a ver si el sitio estaba despejado, era un ejemplo típico de esa conducta negligente de parte de un demandante, "que continúa como un agente activo en producir las condiciones bajo las cuales se recibe la lesión, hasta que llega a ser tarde para que un demandado pueda evitar el accidente."

En el presente caso, según ya se ha indicado, después de llegar a una posición de peligro, la demandante nada hizo para aumentar el riesgo de su situación. Si el accidente hubiese ocurrido en un sitio poco frecuentado, en campo libre, o junto a un camino campestre, y si la demandante no hubiera sido lesionada mientras caminaba por un trecho paralelo a la vía, sino que, sin mirar hacia atrás, se hubiese puesto a caminar por los rieles frente a un carro interurbano en rápido movimiento, entonces podríamos, o no, decir, parafraseando el lenguaje de la Corte de Apelaciones de Maryland, que sería en vano especular acerca de si la demandante hubiera sido lastimada o puesta en peligro, de haberse mantenido en la vereda.

Además, según ya hemos apuntado, la indemnización concedida a la aquí demandante lo fué por daños y perjuicios provenientes de haberle las ruedas del carro lacerado su pierna, no por los irrogados por contacto con el cuerpo del carro o con la tierra, y, como ya se ha demostrado, el accidente que provocó este litigio pudo haber sido obviado por el motorista si su omisión negligente en advertir el peligro de la demandante no se hubiese prolongado hasta el momento mismo del impacto, cuando ya le era muy tarde a la demandante prevenir el percance. No hay conflicto en la prueba al efecto de que él pudo haber detenido el carro en cualquier momento dentro de poquito más del largo de un brazo.

El caso de *Yellick* fué resuelto por un tribunal dividido.

Los hechos narrados en la opinión disidente difieren de los expuestos en la de la mayoría. De acuerdo con el punto de vista de esta última,

"La prueba del demandante demuestra que él podía ver el carro que se aproximaba en todo momento durante su paso desde el borde de la acera hasta el sitio en que se detuvo cerca de la vía para dar una vuelta. Es evidente que el tranvía que lo golpeó estaba cerca de él, y que, necesariamente, él lo habría visto si hubiera mirado antes de dirigir sus pasos hacia la zona de peligro o de penetrar en ella. Tampoco se pone en tela de juicio que nada ocurrió que distrajera su mente o le impidiera ver el carro que se acercaba, de haber mirado mientras recorría los últimos ocho pies de su trayecto, ni sus deberes reclamaban su atención en forma tal que le impidieran mirar. La prueba no da lugar a otra inferencia que no sea la de que él tuvo que haber visto al tren aproximarse si permaneció alerta desde la acera hasta el sitio en que se paró, o de que dejó de prestar la más mínima atención. Su omisión en uno u otro caso, bajo los hechos y circunstancias revelados por la prueba, fué negligencia *per se,* que manifiestamente contribuyó a producir el accidente . . . "

Evidentemente, en opinión de la mayoría, el haber dejado el demandante de percatarse del tren que se acercaba mientras él iba desde el borde de la acera hasta la vía, fué la causa próxima del accidente. La negligencia en que la mayoría basó su fallo fué indudablemente activa, continua y concurrente, a menos que se le despojara de ese carácter por circunstancias no consideradas ni discutidas en absoluto por la corte. Si en el presente caso la demandante, después de atravesar el portón de los Barletta se hubiese puesto a caminar por los rieles frente al tranvía que se acercaba, o si ella hubiera girado hacia la izquierda entre el lado de un carro en marcha y la verja, y al así actuar hubiese sido lesionada, su negligencia habría sido igualmente activa, continua y concurrente. No tenemos motivos para dudar de que si Yellick se hubiera desviado con su carretilla hacia un pasadizo poco menos de un metro de ancho que estaba entre la vía y una verja, y después de caminar alguna distancia por ese pasadizo hubiese sido golpeado por detrás sin recibir

aviso de un carro en marcha que pudo haber sido detenido en cualquier momento dentro de la distancia de un metro, la Corte Suprema de Wisconsin habría llegado a una conclusión distinta. Hasta aquí el Tribunal no parece haber tenido ocasión de considerar la teoría del olvido del peligro por parte de un demandante en relación con la cuestión de negligencia concurrente.

La lectura de la opinión en *Kelly* v. *Boston Electric Railroad Company,* o del primer párrafo del sumario, bastará para distinguir dicho caso del presente.

En *Mey* v. *Seattle Electric Company,* 92 Pac. 283, en que hace algún hincapié la apelante, la situación era algo parecida a la del presente caso, pero sus rasgos distintivos son precisos e importantes. En dicho caso el tribunal sentenciador "concedió la moción de *nonsuit* del demandado fundándose (1) en que no se había probado negligencia de parte del demandado, y (2) en que aparecía de la prueba del demandante que él había sido culpable de negligencia concurrente." La parte de calle entre la vía y el borde de la acera estaba llena de montones de "tierra, grava, formaletas, etc." El dueño de la propiedad lindante con la calle estaba fabricando un muro de contención, y la acera había sido cerrada con una cerca, pero había aberturas por donde podían pasar los transeúntes. También había aberturas a intervalos frecuentes para refugio de las personas que transitaran por entre los materiales de la obra y la vía. Por lo menos en parte del trayecto, había un espacio libre entre los materiales de construcción y la acera que no obligaba a los transeúntes a pasar entre los materiales de construcción y la vía. Además, parece que cuando uno de los carros de la demandada le dió un golpe por la espalda al demandante, éste ya había pasado de los escombros y había llegado a un punto en el cual "había sitio entre un carruaje u ómnibus de hotel y la vía férrea para poder pasar un hombre sin sufrir daño." La

anchura del espacio libre entre la vía y el carruaje u ómnibus de hotel no aparece de la opinión de la corte.

La Corte Suprema de Wáshington dijo:

" . . . Siendo esto cierto, parece evidente que era el deber del apelante, cuando pasaba pegado a esta vía en un sitio por donde, según declaró, transitaban carros a cortos intervalos, ejercer la ordinaria precaución de fijarse, al pasar por aquellos sitios donde no había espacio al mismo tiempo para el hombre y el carro, si había algún carro que pudiera hacerle daño. Según su declaración, la vía estaba tendida en una calle abierta y pavimentada donde con poco que observara habría descubierto un carro al aproximarse. No habiendo tomado esta precaución ordinaria, creemos que el demandante fué indudablemente culpable de negligencia contribuyente. Tampoco aparece de la prueba que hubiera negligencia por parte del motorista del carro. No se ha probado que no se tocara la campanilla en el cruce, o que no se tomaran las precauciones ordinarias. Habiendo sitio para el pasajero ponerse fuera de peligro a cortos intervalos por todo el trecho que anduvo, creemos que el motorista bien podía creerse justificado en inferir que el transeúnte se echaría a un lado de la vía en vez de permanecer en ella o tan próximo a ella que pudiese ser cogido por el carro . . . . "

Si en este caso hubiera habido aberturas o huecos a intervalos frecuentes en la cerca de los Barletta, el de Mey vendría más al caso. Aun si pudiera eliminarse la cerca de los Barletta, nos tropezaríamos con el hecho de que el motorista, de haber estado mirando hacia adelante, pudo haber detenido su carro a tiempo para evitar lacerar la pierna de la demandante después de darse cuenta (como en ese caso se habría dado cuenta) de que la demandante ignoraba el peligro que la amenazaba, y no tenía intención de echarse a un lado. En el caso de Mey (como en el de *Yellick* v. *Northern Ry. Co.*, y en el de *Kelly* v. *Boston Electric Railroad Company, supra*) si se hubiera podido invocar la doctrina del último recurso expedito, o si hubiera habido circunstancias por razón de las cuales la negligencia de la demandante podía haberse considerado como que había cesado, o por razón de las cuales el motorista debió haber sabido que la deman-

dante estaba inconsciente de su situación peligrosa, mientras había aún tiempo para evitar el accidente, tal cuestión no fué planteada ni considerada por la corte. La opinión en el caso de *Locke* v. *Puget Sound International Ry. & Power Co. supra,* resuelto unos diez años más tarde, deja muy poco lugar para dudas en cuanto a cuál hubiese sido el resultado en el caso de Mey si le hubiera sido aparente al motorista que Mey no tenía en el momento medios de escape o de que ignoraba el peligro y no haría esfuerzo alguno para salvarse.

El apelante también cita la opinión emitida por la Sección Primera de La Corte Suprema de California en *Everett* v. *Los Ángeles, etc. Ry. Co.,* 115 Cal. 105, resuelto en 1896. La Corte por mayoría se adhirió a la teoría allí expresada, después de haberla considerado en pleno. Hay una opinión disidente por el Juez Temple con la que estuvieron de acuerdo el Juez Presidente Sr. Beatty y el Juez Asociado Sr. Henshaw. Véase también *Berguin* v. *Pacific Elec. Ry. Co., supra.*

En el caso de Nehring la Corte Suprema de Connecticut dijo:

    " . . . Difícil es encontrar una rama de la ley que haya sido tratada de un modo tan poco satisfactorio e inadecuado por las cortes como ésta, o que más necesite ser resuelta de una manera inteligente y consecuente. Los casos que de algún modo tratan del asunto son numerosos, y tiene uno que ser muy difícil de satisfacer para no encontrar en alguno de ellos apoyo implícito o explícito para sus opiniones preconcebidas."

No nos detendremos a discutir o a hacer distinción del caso de *Warren* v. *Fitchburg Railroad Co.,* 85 Am. Dec. 700 (1864), del que la apelante cita lo siguiente:

    " . . . . Si la prueba del demandante considerada en conjunto no tiende a demostrar cuidado de su parte sino que al contrario revela que fué negligente, es el deber de la corte instruir al jurado, como cuestión de derecho, que rinda veredicto a favor del demandado."

Otros cuatro casos citados pero no discutidos por la apelante merecen solamente mencionarse de paso. Son los siguientes: *Ford* v. *Paducah City Ry.*, 8 R.L.A. (N.S.) 1093; *Creamer* v. *West End St. R. Co.*, 16 L.R.A. 490; *Farrello* v. *New York Ry. Co.*, 168 N. Y. 633, y *Rombach* v. *Crescent City R. Co.*, 23 So. 604.

La única autoridad citada por la apelante en apoyo de su contención de que los hechos expuestos en la demanda no dan derecho a indemnización a la demandante, bajo la doctrina del último recurso expedito, es el caso de *St. Louis & S. F. R. Co.* v. *Schumacher*, 152 U. S. 77. No hay necesidad de que consideremos la cuestión de alegaciones ahora. Cualquier omisión en la demanda enmendada con anterioridad al segundo juicio quedó subsanada por la prueba, y la demandada no pudo ser inducida a error en perjuicio suyo, ni haber sido sorprendida, en vista del resultado en la primera apelación.

*Debe confirmarse la sentencia apelada.*